**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN F. SULLIVAN                    \*
                                   \*
            Plaintiff,             \*
                                   \*
        v.                         \*        Case No. 07-00685 (RWR)
                                   \*
CENTRAL INTELLIGENCE AGENCY        \*
et al.,                            \*
                                   \*
        Defendants.                \*
                                   \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFF'S MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Plaintiff John F. Sullivan ("Sullivan") served as an employee of the Central

Intelligence Agency ("CIA") for over thirty years, conducting more polygraph

examinations for the CIA than any other polygrapher in the Agency's history. This action

is brought against defendants CIA, its Director, General Michael V. Hayden, and several

unidentified CIA employees (collectively, the "CIA") for violating Sullivan's

constitutional and statutory rights by issuing an adverse security clearance determination,

and disseminating inaccurate information to third parties, in order to retaliate against his

lawful exercise of First Amendment rights.

The thrust of the CIA's arguments is the premise that federal agencies can abuse

otherwise-constitutional administrative proceedings as a method of intimidating former

employees who seek to publish literary works which portray the agency in an unflattering

light and then escape liability by simply remedying the overarching harm and ignoring

everything else. In light of the specific factual circumstances of this case, including

questions surrounding the extent to which inaccurate information was unlawfully

disseminated outside of the CIA, as well as whether the CIA attempted to subsequently cover up procedural failures committed by the polygraph examiners, this Court should reject the CIA's Motion at this early stage and allow discovery to proceed. Whether the CIA's argument will prevail at a later stage, particularly on the merits, is something that can be determined at that time.

Additionally, in order to undercut Sullivan's legal claims the CIA and defendant Department of Justice ("DOJ"), as part of its prosecution of this case, publicly disclosed privacy-protected information without consent or justification. By, most notably, inappropriately disclosing Sullivan's social security number ("SSN") for the world's scam artists to acquire and abuse, the agency defendants willfully and intentionally violated the Privacy Act and caused Sullivan to suffer provable actual damages. This claim, as well, legitimately survives the defendants' Motion to Dismiss.

### FACTUAL BACKGROUND

Sullivan worked for the CIA as a polygraph examiner from 1968-1999. First Amended Complaint at ¶3 (dated November 5, 2007)("FAC"). In 2002, Sullivan wrote *Of Spies and Lies: A CIA Lie Detector Remembers Vietnam* (University Press of Kansas, 2002). Id. at ¶8. In accordance with his secrecy agreement with the CIA, Sullivan submitted that book to the CIA for review by the Publication Review Board ("PRB"). Id. at ¶9. After the PRB completed its review and informed Sullivan that no classified information was contained in the book (or that information that was classified was properly excised), the book was published. Given that the contents of the book did not portray the CIA in a very positive light, it is believed that various elements and individuals within the CIA were not pleased about the publication of the book. Id.

In November 2003, Sullivan applied for a position with the Clandestine Service Reserve Cadre. This position required an active security clearance. Id. at ¶11. Soon thereafter, in early 2004, Sullivan submitted a second manuscript to the PRB for review: *Gatekeeper: Memoirs of a CIA Polygraph Examiner* (Potomac Books, 2007). The book presents a very critical portrait of the CIA's polygraph program and several specific polygraphers. Id. at ¶10.

On or about March 11, 2004, Sullivan was administered a CIA administered polygraph examination for purposes of obtaining a security clearance. Id. at ¶12. During the course of the polygraph examination, the polygraph examiner, Doe #1, failed to follow several standard polygraph procedures as set forth within CIA regulations. Id. at ¶13. The polygraph examiner intentionally included certain details within his report that CIA written policy notes should be excluded. Id. at ¶15. The polygraph examiner's questions pertained to, and in fact emphasized, the substantive content of Sullivan's second book. Id. at ¶16.

The polygraph examination itself failed to comply with CIA written policies. One such example consisted of the examiner's failure to submit the examination for Qualify Assurance ("QAS") review. As described in a letter from John Doe #2, Chief, Polygraph Division and dated October 11, 2005, the polygraph examiner was instructed by the Chief Examiner to return to the test site and not to run another chart until Sullivan made an admission. The issuance of these instructions was verified by the Team Leader. Id. at ¶14.

Another such example occurred on March 25, 2004, when Sullivan met with a "Security Professional", Doe #3, who told him his test was "Unresolved Reactions to All Issues". At the end of that interview, Doe #3 stated "There is something about your book

that you're not telling us, and until you do I can't help you." Thereafter, Doe #3 smirked and accused Sullivan of lying. This very clearly implied to Sullivan that he would be a "liar" for as long as he was trying to have this book about the CIA's polygraph program published. Id. at ¶17.

In or around August 2004, Sullivan was asked to take a position requiring a security clearance with Raytheon Company. Id. at 18. In response to Raytheon's request for information pertaining to Sullivan, the CIA disseminated inaccurate and derogatory information pertaining to alleged security violations and personal conduct committed by Sullivan.

On or about February 11, 2005, Sullivan received a letter dated, January 28, 2005, denying his request for a security clearance. Despite the fact that the CIA routinely informs individuals who complain about a polygraph examination that it is only one part of the process that is relied upon to reach a clearance decision, in Sullivan's case the CIA's decision rested solely upon information derived from and conduct that occurred during the polygraph examination, which is a violation of written CIA regulations. Id. at ¶19.

By letter dated February 15, 2005, Sullivan timely appealed the denial decision. Id. at ¶20. As part of his administrative appeal, Sullivan was provided an unclassified redacted copy of his investigative file that was compiled in conjunction with Sullivan's security processing. Id. at ¶21. Upon reviewing the investigative documents Sullivan noted numerous factual inaccuracies and omissions were present. For example, interviews with individuals who served as favorable references for Sullivan were missing. Moreover, the file noted Sullivan's wife was a foreign national whom he had met in Vietnam. Sullivan's

wife's birthplace, in fact, was Laredo, Texas. This fact was known to the CIA because Sullivan's wife had worked for the CIA for many years, and he had provided his wife's birthplace and date of birth in his SF-86. Id. at ¶22.

On or about June 26, 2005, Sullivan inquired with a former colleague in order to try and determine why he was denied a clearance. In a telephone conversation with "Robert Roe", Chief/QAS, he was told "You have been treated very unfairly by this office." Apparently, "Robert Roe" was not even aware of Sullivan's test having taken place. Upon information and belief, the Chief Polygraph Examiner had intentionally withheld the test results from QAS, which constitutes an egregious violation of polygraph protocol as set forth in written CIA regulations. Upon further information and believe, it is likely this fact alone was a key motivating factor in the CIA's reversal of Sullivan's clearance denial. Id. at ¶23.

In approximately late June 2005, the CIA sent Sullivan an unclassified letter informing him that the decision to deny him a security clearance was reversed. Id. at ¶24. In a virtually unprecedented decision, the CIA chose to reverse its prior denial prior to even an initial "personal appearance" or other form of supplementary information being submitted. Id. at ¶26. Upon information and belief the CIA's decision to reverse the initial denial in such an unprecedented manner would not have occurred if the "security professional", Doe #3, actually believed that Sullivan was lying or if the alleged security violations and personal conduct had any legitimate factual basis. This belief was strengthened by an e-mail from "Robert Roe", dated September 28, 2005, which stated: "I can assure you that the security professional was not correct regarding the results of your test….I am at a lost (sic) to explain the time involved in your situation." Id. at ¶27.

The initial denial of his security clearance constituted nothing more than retaliation for the exercising of Sullivan's First Amendment rights. Id. at ¶27. Moreover, as a direct result of the intentional delays associated with the ultimate granting of Sullivan's security clearance, the positions for which he had applied or were offered to him – including, but not limited to, the positions with the Clandestine Service Reserve Cadre and Raytheon Company – were lost. During this time period, which consisted of nearly fifteen months, Sullivan was also unable to attend job fairs that required a security clearance. Id. at ¶28.

Additionally, notwithstanding the fact that the CIA reversed its initial decision to deny Sullivan a security clearance, all of the inaccurate and derogatory information the CIA claimed applied to Sullivan in the first place continues to be maintained by the CIA and can and will be used against him whenever future security clearance proceedings are initiated. Id. at ¶24.

In or around April 2007, the PRB finally granted approval for publication of *Gatekeeper*. Upon information and belief certain individuals and offices within the CIA deliberately contributed to the nearly three year delay in obtaining approval. Id. at ¶10. To put the three year time frame to approve *Gatekeeper* in context with the mere month required to gain approval for *Of Spies and Lies*, the former required the redaction of fifteen (15) words out of 115,000 and the latter required the redaction of eleven (11) words out of 112,000. See Declaration of John F. Sullivan at ¶4 (dated January 26, 2008)("Sullivan Decl."), attached at Exhibit "1".

In or around Spring/Summer 2007, the CIA retrieved one or more documents, to include, but is not limited to, a letter from the CIA to Sullivan dated January 28, 2005, a letter from Sullivan to the CIA dated February 15, 2005, and a letter from Sullivan to the

CIA dated March 15, 2005, that were filed within a Privacy Act System of Records. FAC at ¶29. Sullivan's letters contained his personal e-mail address, and home telephone number and address. Id. at ¶30. The CIA's letter to Sullivan contained his SSN. Id. at ¶31. The CIA disclosed one or more documents, to include those described in paragraph 29, to the DOJ where they were then filed within a DOJ system of records. Id. at ¶32. On or about August 31, 2007, the DOJ, as the legal representative and/or agent of the CIA, publicly filed within the U.S. District Court for the District of Columbia these three documents containing Sullivan's e-mail address, home telephone number and address and SSN. Id. at ¶33. At no time did Sullivan ever provide either the CIA or DOJ his written or verbal consent to publicly disclose or disseminate these three records or the information contained therein. Id. at ¶34; Sullivan Decl. at ¶13. While it is unknown at this time whether anyone obtained Sullivan's SSN due to the actions of the defendants, Sullivan incurred out-of-pocket costs to purchase a copy of his credit report in order to track any fraudulent use of his personal information. Id. at ¶15. He plans to periodically incur additional expenses in order to periodically check his credit report to ensure the defendants' actions do not cause him further harm. Id.

On November 5, 2007, Sullivan submitted a request for amendment in order to correct inaccuracies within records maintained in various CIA System of Records that pertain to him. Should the CIA deny this request the appropriate cause of action will be added to this or another lawsuit. FAC at ¶35.

Sullivan would like to continue to write and speak on matters related to his past employment with the CIA. Pursuant to his secrecy agreement it is a mandatory in perpetuity requirement that he submit all such writings to the CIA for classification

review. It appears unequivocally clear to Sullivan that any submission by him that contains negative commentary concerning the CIA's polygraph division and its polygraphs will serve as the cause of further retaliation and harassment. Any writing that he submits concerning polygraphs is ultimately reviewed by one or more persons within the CIA's Polygraph Division. Declaration of Mark S. Zaid, Esq. at ¶5 (dated March 27, 2008)("Zaid Decl."), attached at Exhibit "2".

In fact, in July 2007, Sullivan submitted to the CIA for classification review a proposed chapter for a new textbook for the Department of Defense polygraph school. FAC at ¶36; Sullivan Decl. at ¶12. On or about August 22, 2007, the PRB responded with required redactions that were so extensive as to cause him to abandon the project, which is likely what the CIA's Polygraph Division desired. In fact, the letter received by Sullivan was perceived as intimidating. Id. On September 11, 2007, a PRB representative called Sullivan and asked him to reconsider resubmitting the document because the PRB "may have been a little over the top with the redactions." However, Sullivan chose not to appeal because the CIA's prior actions chilled his interest in pursuing any further challenges. Id. Most recently Sullivan submitted a short uncontroversial document to the PRB on October 30, 2007. However, any additional submissions that could cause retaliation by the CIA have caused him to refrain from taking on any future controversy projects. Id.

## **ARGUMENT**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) presents a threshold challenge to the Court's jurisdiction. Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987). The Court may resolve a Rule 12(b)(1) motion based solely on the

complaint, or if necessary, may look beyond the allegations of the complaint to affidavits and other extrinsic information to determine the existence of jurisdiction. Id. at 908. The Court must accept as true all the factual allegations contained in the complaint, but the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence. Bennett v. Ridge, 321 F. Supp. 2d 49, 51-52 (D.D.C. 2004).

A motion filed under Rule 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The district court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor. Macharia v. United States, 334 F.3d 61, 64, 67 (D.C. Cir. 2003).

## I.    SULLIVAN'S PRIVACY ACT CLAIM IN HIS FOURTH CAUSE OF ACTION SHOULD NOT BE DISMISSED[1]

The Privacy Act states that:

> No agency shall disclose any record which is contained in a system
> of records by any means of communication to any person, or to
> another agency, except pursuant to a written request by, or with the
> prior written consent of, the individual to whom the record
> pertains.

5 U.S.C. § 552a(b). Further, each agency that maintains a system of records shall, "prior to disseminating any record about an individual to any person other than any

---

[1] Sullivan respectfully abandons his Privacy Act claims under subsection (e)(5) set forth in this Third Cause of Action.

agency...make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." Id. at § 552a(e)(6).

Sullivan's First Amended Complaint asserts that the "CIA and one or more of the individual defendants has already disseminated inaccurate information from Sullivan's Privacy Act System of Records to one ore more government contractors that resulted in interfering with Sullivan's hiring due to alleged security concerns." FAC at ¶61. The defendants have moved, pursuant to both Rule 12(b)(1) and (6), for dismissal of Sullivan's claim. For whatever reason the defendants make only a passing reference to Sullivan's subsection (e)(6) claim by simply describing in a single sentence what they view it to state. Defendants' Memorandum in Support of Defendants' Motion to Dismiss First Amended Complaint at 9 ("Defs' Memo")(Dkt. #9). Sullivan has asserted that the CIA improperly disseminated inaccurate information, including that he lacked clearance eligibility, from within his Privacy Act system of records that led to a defense contractor deciding not to pursue him for employment. Sullivan Decl. at ¶10.

The (e)(6) provision requires a reasonable effort by the agency to review records prior to their dissemination. See NTEU v. IRS, 601 F. Supp. 1268, 1272 (D.D.C. 1985). The information that was allegedly disseminated is neither opinion nor constitutes subjective evaluation. It is factual and verifiable. See McCready v. Principi, 297 F. Supp. 2d 178, 197 (D.D.C. 2003)(finding that record "reflects only . . . opinion and not Privacy Act facts and, as such was 'accurate, complete, timely, and relevant for agency purposes'"), rev'd in part, aff'd in part, 465 F.3d 1 (D.C. Cir. 2006).

At this early stage of the litigation Sullivan is entitled to discovery in order to pursue his Privacy Act claim and, therefore, the CIA's Motion to Dismiss should be denied.

**A. Application Of The <u>Egan</u> Precedent Does Not Cause Sullivan's Privacy Act Claim To Fail For Lack Of Jurisdiction**

The CIA paints a broad brush to attack Sullivan's Privacy Act claim by claiming the Judiciary as a whole lacks both the competence and authority to ever exercise judicial review over statutory claims that implicate an agency's security clearance decision, although it makes no effort to explain how this pertains to an (e)(6) claim. The CIA's basis for attack is the Supreme Court's ruling in <u>Department of Navy v. Egan</u>, 484 U.S. 518 (1988) and its progeny. Defs' Memo at 9. As far as the CIA is concerned, any statutory claim that even touches upon a security clearance decision would, by necessity, require a court to review the merits of the decision itself, something which the CIA believes is beyond the competence of the Judiciary.

The CIA's construction of the precedent set forth in <u>Egan</u> is completely misplaced. At no point did the Supreme Court create a blanket rule that courts are incapable of ever exercising judicial review over claims implicating security clearance decisions. To the contrary, the scope of the ruling was limited to an assessment of the statutory authority afforded to the Merit Systems Protection Board ("MSPB") by the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §§ 7500 <u>et seq</u>. <u>See Egan</u>, 484 U.S. at 520, 530.[2] <u>See also</u> <u>Duane v. Dep't of Defense et al.</u>, 275 F.3d 988, 993 (10th Cir. 2002)(<u>Egan</u> "explicitly applied only to review by an external administrative board"). Any premise beyond that is extrapolation of dicta.

---

[2] The Court did hold that the decision to terminate Egan's employment due to the denial of a security clearance arguably fell within the confines of removal "for cause" under 5 U.S.C. § 7513. <u>Egan</u>, 484 U.S. at 530. While that provision of the CSRA empowered the MSPB to afford certain procedural protections to Egan, the Court concluded that it did not confer upon the MSPB the authority to evaluate the merits of the security clearance decision. <u>Id</u>.

Furthermore, review by this Circuit - as well as others - serves only to strengthen the argument that Egan stands for the notion that certain specific statutes, in and of themselves, do not confer authority upon courts to exercise judicial review in substantive situations pertaining to security clearance decisions. See e.g., Weber v. United States, 209 F.3d 756, 759 (D.C. Cir. 2000)(whistleblower protection provisions of the Civil Service Reform Act do not provide for judicial review); Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999)("[A]n adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII")[3]; United States Info. Agency v. Krc, 905 F.2d 389, 395-397 (D.C. Cir. 1990)(Foreign Service Act and Administrative Procedure Act do not provide for judicial review); Guillot v. Garrett, 970 F.2d 1320, 1326 (4th Cir. 1992)(Rehabilitation Act of 1973 does not provide for judicial review).

While certain statutes may indeed fail to provide authority to the courts to review substantive challenges to security clearance determinations, it does not by necessity follow that every challenge that even touches upon a security clearance decisions can never properly be the subject of judicial review. Even in the immediate aftermath of Egan, the Supreme Court reemphasized that courts are more than capable of properly balancing the needs of a plaintiff challenging a substantive determination that directly confronts the Executive Branch's – and indeed the CIA's – decision in the area of national security. Webster v. Doe, 486 U.S. 592, 604 (1988). Webster was decided just months after Egan by the very same Justices. Unless the CIA can demonstrate that the Justices developed amnesia on that day, clearly they took into account the determination in Egan when issuing Webster.

_____

[3] In fact, the D.C. Circuit in Ryan went out of its way to explicitly "emphasize that our holding is limited to Title VII discrimination actions". 168 F.3d at 524.

This Circuit has similarly reaffirmed the idea that the authority to exercise judicial review, not the concern that the courts lack the expertise to "second-guess" agency security clearance decisions, is the true legal burden that must be met for challenges to security clearance decisions. See e.g., Nat'l Fed'n of Fed. Employees v. Greenberg, 983 F.2d 286, 289-90 (D.C. Cir. 1993)(plaintiffs' Fifth Amendment claims pertaining to the government's judgments about what information employees must disclose during security clearance investigations were properly subject to judicial review); Krc, 905 F.2d at 400 (concluding that while the Foreign Service Act did not afford statutory authority to review the merits of the revocation of the security clearance and subsequent termination of a Foreign Service officer, the court retained the authority to review plaintiff's constitutional challenge to the agency's determination).

The CIA has not cited – and indeed can not cite – to any binding case law that supports the notion that a Privacy Act claim of inaccurate dissemination under subsection (e)(6) fails to afford adequate statutory authority to the courts to properly exercise judicial review over a challenge even involving an intelligence agency.

## B. The Civil Service Reform Act Has No Application To Sullivan's (e)(6) Privacy Act Claim

The D.C. Circuit is replete with case law favorable to the argument that the Privacy Act provides adequate statutory authority permitting judicial review over challenges that do not conflict, as is the case here, with the CSRA. See e.g., Kleiman v. Dep't of Energy, 956 F.2d 335, 337 (D.C. Cir. 1992)("The need to read the Privacy Act without doing violence to the Civil Service Reform Act [] supports our conclusion that the former does not encompass this type of claim."); Hubbard v. EPA, 809 F.2d 1, 5 (D.C. Cir. 1986)("[T]he obvious need to accommodate the [Privacy Act and CSRA's] statutory

schemes requires the district courts to analyze the asserted causation link to be certain they are not exceeding their jurisdiction."); Lee v. Geren, 480 F. Supp. 2d 198, 206 (D.D.C. 2007)(D.C. Circuit careful to only disallow Privacy Act claims that plainly fall within prohibitory scope of CSRA and evaluated merits of all other Privacy Act claims "with an eye to avoiding conflict with the CSRA").

The CIA has chosen to portray Sullivan's Privacy Act claims as a challenge to the CIA's ultimate decision not to hire Sullivan for the Clandestine Service Reserve Cadre, thereby bringing Sullivan's claims directly into conflict with the CSRA. Defs' Memo at 11-12. This portrayal constitutes a considerable distortion of the facts, for at no time has Sullivan ever asserted that he is challenging – either directly or indirectly – the merits of the CIA's decision not to hire him.[4] In contrast, Sullivan's challenge remains narrowly focused on the CIA's Privacy Act violation of disseminating inaccurate information to third parties.

This cases cited by the CIA provide support for a completely different claim than that asserted by Sullivan under the Privacy Act. See e.g., Kleiman, 956 F.2d at 338 (plaintiff challenged classification of job title, not record accuracy; classification decisions within scope of CSRA); Hubbard, 809 F.2d at 3, 5 (claim alleged wrongful personnel action, not record "inaccuracy"). As Sullivan is neither challenging the merits of his adverse security clearance or employment decisions, the CSRA does not preclude a Privacy Act claim.

---

[4] The CIA's references to Sullivan's statements in the FAC, that the initial denial of his security clearance resulted in the denial of his application for the position at CIA, do not provide any additional support to the CIA's arguments. The cited-to statements were derived from the "factual background" section of the FAC, and specific references indicating that Sullivan is challenging the merits of the CIA's decision to deny his application for employment due to the denial of his security clearance are completely absent from Sullivan's Privacy Act "cause of action" sections.

Accordingly, the CIA's arguments that Sullivan's Privacy Act claim must fail for lack of jurisdiction by way of separation of powers and the CSRA are without merit.

**C.  The Appropriate Statute Of Limitations Has Not Yet Run On Sullivan's (e)(6) Privacy Act Claim**

Privacy Act claims must be filed "within two years from the date on which the cause of action arises." 5 U.S.C. § 552a(g)(5). The critical issue is determining the time at which "the plaintiff first knew or had reason to know that allegedly inaccurate records were being maintained." Defs' Memo at 13.

This case was filed on April 5, 2007. Sullivan did not know or have a reason to know of the CIA's improper release of information from his Privacy Act System of Records until in or around sometime in the Fall of 2005. Sullivan Decl. at ¶10; FAC at ¶28. Thus, as this allegation is within the two year window, this claim was timely filed.

**D.  At This Initial Stage, Discovery Is Justified On Sullivan's Privacy Act Claim**

The D.C. Circuit has instructed that granting a "Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction." Herbert v. National Academy of Sciences, 974 F.2d 192, 198 (D.C. Cir. 1992)(citation omitted).  Additionally, although the defendants seemingly complain that certain information is lacking within Sullivan's Complaint, see Defs' Memo at 9, complaints "need not plead law or match facts to every element of a legal theory." Krieger v. Fadely, 211 F.3d 134, 136 (D.C. Cir. 2000)(citation omitted).

As with any Privacy Act claim for actual damages pursuant to 5 U.S.C. § 552a(g)(4), a plaintiff must demonstrate that the agency "acted intentionally or willfully in failing to maintain accurate records." McCready, 465 F.3d at 10 n.5 (quotation omitted). This Circuit has ruled that acting "intentionally or willfully" must constitute "something

15

greater than gross negligence" in maintaining accurate records. See Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987). To satisfy his burden, Sullivan must be able to demonstrate that the CIA acted "without grounds for believing [its actions] lawful" or that it "flagrantly disregarded" the rights guaranteed under the Privacy Act. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987), quoting Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984).

This District routinely first permits discovery in Privacy Act cases such as this before dismissal is contemplated. A quick review of decisions within the last few years amply supports this premise. See e.g., Elliott v. Fed. Bureau of Prisons, 521 F. Supp. 2d 41, 44 (D.D.C. 2007); Tripp v. DoD, 219 F. Supp. 2d 85, 93-94 (D.D.C. 2002); Murphy v. United States, 167 F. Supp. 2d 94, 97 (D.D.C. 2001); Alexander v. FBI, 194 F.R.D. 316, 319 (D.D.C. 2000); Sirmans v. Caldera, 27 F. Supp. 2d 248, 249 (D.D.C. 1998); Lowe v. Winter, 2007 U.S. Dist. LEXIS 49962 (D.D.C. July 12, 2007); Scarborough v. Harvey, 2007 U.S. Dist. LEXIS 36952, *2 (D.D.C. May 22, 2007); Leighton v. CIA, 2007 U.S. Dist. LEXIS 26667 (D.D.C. April 11, 2007); Doe v. Goss, 2007 U.S. Dist. LEXIS 2708 (D.D.C. January 12, 2007); Hutchinson v. Tenet, 2003 U.S. Dist. LEXIS 26182 (D.D.C. August 28, 2003); Melius v. Nat'l Indian Gaming Comm'n, 2000 U.S. Dist. LEXIS 22747, *1 (D.D.C. July 21, 2000).[5]

Therefore, the CIA's Motion to Dismiss should be denied at this stage of the proceedings.

---

[5] In Leighton v. CIA, 2007 U.S. Dist. LEXIS 26667, *4-*6 (D.D.C. April 11, 2007), Judge Oberdorfer denied the CIA's initial Motion to Dismiss under Rule 12(b)(6) in a Privacy Act case, particularly after the plaintiff offered to submit a proposed discovery plan. Sullivan is more than willing to do the same if requested.

## II.  SULLIVAN IS ENTITLED TO RELIEF BASED ON THE CIA'S DEPRIVATION OF HIS FIRST AMENDMENT RIGHTS

The Supreme Court has long recognized that expression about public issues rests "on the highest rung of the hierarchy of First Amendment values." Carey v. Brown, 447 U.S. 455, 467 (1980). The constitutional protection for freedom of expression on public matters, which was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth v. United States, 354 U.S. 476, 484 (1957), is at the very core of our constitutional and democratic system. Stromberg v. People of State of Cal., 283 U.S. 359, 369 (1931). In addressing First Amendment challenges courts must keep in mind that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)(citation omitted).

That said, Sullivan's ability to disseminate his writings is legitimately subject to certain limitations due to his prior affiliation with the CIA.[6] Moreover, Sullivan is not asserting that either the prepublication review or security clearance processes are unconstitutional. Instead, it is Sullivan's contention that: 1) the CIA was – to say the least

---

[6] Sullivan's relationship with the CIA actually extenuates the First Amendment significance of his claims. As Judge Kessler noted recently in a prepublication review case "the FBI, by its very nature, is not an open institution, and very few people are knowledgeable about its inner operations. For that very reason, the views of knowledgeable, informed, experienced 'insiders' are of particular utility." Wright v. FBI, 2006 U.S. Dist. LEXIS 52389, *23 (D.D.C. July 31, 2006). It would seem obvious that the same rationale applies equally, and in fact more, to the CIA. As Justice Jackson recognized in American Communications Assn. v. Douds, 339 U.S. 382, 442 (1950), "[t]he priceless heritage of our society is the unrestricted constitutional right of each member to think as he will. Thought control is a copyright of totalitarianism, and we have no claim to it. It is not the function of our Government to keep the citizen from falling into error; it is the function of the citizen to keep the Government from falling into error." Id. at 443.

– displeased with the criticisms detailed in his books and subsequently retaliated against

him by unduly delaying publication approval of *Gatekeeper* and unlawfully and

unethically utilizing the security clearance process to intimidate him; and 2) as a result of

this retaliation, Sullivan's interest in challenging the CIA's classification decisions has

been chilled.

By virtue of these arguments, the CIA has deprived Sullivan of his rights under the

First Amendment. Therefore, its' Motion should be denied without prejudice and

discovery should be permitted.

## A.  Sullivan Has Proper Standing To Assert A Viable First Amendment Claim

It is undisputed that standing is a jurisdictional doctrine grounded in the case-or-

controversy requirement of Article III of the Constitution. See Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560 (1992). It is similarly undisputed that to demonstrate

standing a party must show an injury-in-fact caused by the conduct of the defendants that

can be redressed by judicial relief. Id. at 560-61.

The CIA seeks to narrowly construe the requirements for standing to seek declaratory

relief as set forth by the Supreme Court in City of Los Angeles v. Lyons, 461 U.S. 95

(1983), highlighting that "'past exposure to illegal conduct' alone does not suffice to

show standing" and that the plaintiff must be able to show a "real and immediate" threat

that he will be subjected to the illegal conduct again. Defs' Memo at 19, quoting Lyons,

461 U.S. at 102, 105. The CIA's analysis omits two critical components of the legal

standard for standing to seek declaratory relief, namely: 1) whether the "past exposure to

illegal conduct" was unaccompanied by any continuing, present adverse effects; and 2)

whether there are other adequate remedies at law to address the illegal conduct. Id. at

102-3.[7]

In assessing the first component, the D.C. Circuit has focused its analysis on a

plaintiff's ability to successfully apply the "capable of repetition yet evading review"

exception to the mootness doctrine. Pharmachemie B.V. v. Barr Labs, Inc., 276 F.3d 627,

631-32 (D.C. Cir. 2002). It is well-established that the exception applies in circumstances

in which: 1) the challenged action was in its duration too short to be fully litigated before

its cessation or expiration; and 2) there was a reasonable expectation that the same

complaining party would be subjected to the same action again. Id. at 633, citing

Weinstein v. Bradford, 423 U.S. 147, 149 (1975). See also Friends of the Earth, Inc. v.

Laidlaw Envtl. Services, Inc., 528 U.S. 167, 174 (2000)("[a] defendant's voluntary

cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case").

This case is more than appropriate to invoke the "capable of repetition yet evading

review" exception. See e.g., Burlington Northern Railroad Co. v. Surface Transportation

Bd., 75 F.3d 685, 690 (D.C. Cir. 1996)(noting that agency conduct of less than two years

---

[7] The D.C. Circuit permits challenges to the future imposition of an overarching policy upon which a specific agency action was based, even if the specific agency action is moot, so long as the plaintiff can demonstrate standing to bring the forward-looking challenge and the request for relief was ripe. See City of Houston v. Dep't. of Hous. & Urban Dev., 24 F.3d 1421, 1428-30 (D.C. Cir. 1994), citing Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122-24 (1974). The fact that a policy may be "informal", rather than articulated in regulations or an official statement of policy, is irrelevant for purposes of determining mootness. Payne Enters., Inc. v. United States, 837 F.2d 486, 491 (D.C. Cir. 1988). In Sullivan's case he can demonstrate that the likelihood of the action recurring is both real and imminent, and that the CIA's policy of using its otherwise-lawful prepublication review and security clearance proceedings as a method of retaliation against those who exercise their First Amendment rights to the public relations detriment of the CIA has sufficiently "crystallized" for purposes of ripeness, he can challenge the CIA's overarching policy of using the proceedings for retaliatory purposes as well. Zaid Decl. at ¶¶4-5.

duration will ordinarily evade review). There also exists continuing, present adverse effects as Sullivan's exposure to the past misconduct has chilled his willingness to subject himself to the same type of retaliatory conduct he previously experienced. Sullivan Decl at ¶¶11-12. The CIA has offered no evidence to establish a "reasonable expectation" that it will not employ the same tactics in the future. Indeed, all past evidence indicates that the PRB's excessive delays and reversals, as well as the use of the security clearance proceedings as a method of inflicting harm on individuals and forcing them to withdraw from the process, constitutes a routine pattern and practice. See Zaid Decl. at ¶¶4-5.

More specifically, this very Court recently addressed the extent to which a plaintiff has to demonstrate, prior to discovery, that the alleged injury was a continuing one with present, adverse effects. In Matthews v. District of Columbia, 521 F. Supp. 2d 79, 82 (D.D.C. 2007), the government's argument that the plaintiffs lacked standing to seek declaratory relief pursuant to a due process claim was rejected. This Court concluded that it was premature to conclude that the plaintiffs lacked standing to seek declaratory relief when there was no evidence in the record indicating that plaintiffs would be unable to show that they were likely to suffer the same injury again. Id. Cf. Fraternal Order of Police, D.C. v. Rubin, 134 F. Supp. 2d 39 (D.D.C. 2001)(three year internal investigation into allegedly unlawful conduct and issuance of new agency policy prohibiting conduct created sufficient record to establish that challenged conduct was not likely to recur again).

Similarly, in Sullivan's case the record is currently insufficient to support the CIA's unsubstantiated conclusion that simply because it reversed its initial denial of Sullivan's

security clearance and ultimately approved publication of *Gatekeeper* that Sullivan is not likely to be subjected to the same retaliatory conduct in the future, or that he will have the ability to timely challenge any future misconduct. Sullivan still continues to submit – albeit it with chilled hesitation – documents to the PRB for review and he has also demonstrated that he continues to seek employment in his chosen career for positions that ordinarily require a security clearance. FAC at ¶36. See Ranger v. Tenet, 274 F. Supp. 2d 1, 9 (D.D.C. 2003)(rejecting CIA standing argument regarding constitutional claim).

Furthermore, there are no other adequate remedies at law for Sullivan – or any other person subjected to this type of retaliatory conduct – to pursue in order to obtain relief in the event of future harm. There is no other state, federal or administrative remedy available that can be utilized to seek relief from the harm alleged in this action. Compare with Lyons, 461 U.S. at 103 (existence of state and federal remedies undercut plaintiffs' argument for declaratory relief).

Accordingly, the CIA's argument that Sullivan can not demonstrate that he has standing to seek declaratory relief should be discarded at this time.

**B. Sullivan Can Sufficiently Demonstrate An Actionable First Amendment Retaliation Claim**

The CIA argues that Sullivan can not state a First Amendment retaliation claim because security clearance and prepublication review proceedings do not constitute the sort of conduct that could give rise to such a claim, and that he has not alleged the requisite adverse effect on speech, namely that the CIA's conduct "effectively chilled" his exercise of his First Amendment right. Defs' Memo at 20-23.

The D.C. Circuit has taken an expansive view of what constitutes an actionable "adverse action". See Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994)(act of retaliation

as trivial as failing to hold birthday party can suffice for First Amendment purposes),

citing Rutan v. Republican Party, 497 U.S. 62, 76 n.8 (1990).[8] Thus, the CIA's assertion

that Sullivan can not identify an "adverse action" that was taken against him - as

*Gatekeeper* was ultimately approved for publication and his security clearance was

granted – is inherently flawed as Tao supports the notion that proof of intimidating and

harassing conduct can by itself give rise to a First Amendment retaliation claim. The

CIA's subsequent reliance upon Penthouse Internat'l Ltd. v. Meese, therefore, is by

necessity ultimately misplaced. Id. 939 F.2d 1011, 1016 (D.C. Cir. 1991)( "We know of

no case in which the first amendment has been held to be implicated by governmental

action consisting of no more than governmental criticism of the speech's content.").

Unlike in Penthouse, where the government officials lacked the authority to even threaten

the imposition of sanctions in conjunction with their criticism, id., in Sullivan's case the

CIA maintained and continues to maintain the authority to unduly delay/prohibit

publication of manuscripts and deny the granting of security clearances. The combination

of this authority with the CIA's retaliatory utilization of its security clearance and

prepublication review proceedings – including the CIA's failure to follow internal

regulations concerning polygraph examinations and its unlawful reliance upon inaccurate

information as the basis for the findings that served as justification for the initial denial of

Sullivan's security clearance – constitutes an "adverse action" adequate for First

Amendment retaliation purposes.

---

[8] Admittedly, the D.C. Circuit has chosen to take a more expansive view of the Supreme
Court's ruling in Rutan than other Circuits. See Thompson v. District of Columbia, 2004
U.S. Dist. LEXIS 30515, *7 (D.D.C. 2004). That said, the CIA's invocation of decisions
from other Circuits that adopted a more limited construction, see Defs' Memo at 21-22,
do not serve to overcome our Circuit's precedent.

Finally, the standard for determining whether there has been the requisite adverse effect on speech necessary for a First Amendment retaliation claim focuses on whether the agency conduct in question is the type of conduct likely to "deter a person of ordinary firmness from that exercise." Toolasprashad, 286 F.3d at 585. In Sullivan's case, his decision to publish a book in effectuation of his First Amendment right resulted in intimidating and harassing conduct by CIA officials – as well as being subjected to procedures not in accordance with internal CIA regulations - during his security clearance proceedings and a several month administrative battle with CIA to reverse the denial of his security clearance. FAC at ¶¶12-24. This delay resulted in the loss of at least one job with a private civilian employer and Sullivan's exclusion from job fairs which required a security clearance. Id. at ¶¶18, 28.

Furthermore, Sullivan's most recent submission to the PRB was so heavily redacted that it caused Sullivan to abandon the project (even when the CIA suggested he continue forward), lest he embroil himself yet again in controversy with the CIA that could jeopardize his security clearance and career. Id. at ¶36; Sullivan Decl. at ¶12. Given the weight of what Sullivan's exercise of his First Amendment rights cost him financially and emotionally, and bearing in mind that the controversy surrounding the book was due to its criticisms of the CIA, Sullivan, at this early stage, should be held to have met the burden of demonstrating that the CIA's conduct would deter a person of "ordinary firmness" from engaging in similar exercises of speech. Evidence does exist that Sullivan, as a result of the defendants' retaliation, showed a change in behavior. Cf. Hatfill v. Ashcroft, 404 F.Supp.2d 104, 119 (D.D.C. 2005)(citations omitted)("where a

party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech").

Accordingly, the CIA's Motion to Dismiss should be dismissed at this stage.

## III. SULLIVAN HAS ASSERTED A VIABLE FIFTH AMENDMENT CLAIM

The Supreme Court has been clear in its view that the protections of the Fifth Amendment in relation to liberty interests pertain not merely to "freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge … and generally to enjoy those privileges long recognized … as essential to the orderly pursuit of happiness by free men." Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972). When those interests are implicated by government action, the right to some kind of hearing is paramount. Id. at 569-70.

Sullivan can demonstrate, at least to a sufficient degree to overcome an initial Motion to Dismiss, that he was deprived of protected liberty interests under both the "reputation-plus" and "stigma or disability" prongs of the liberty interest analysis. Moreover, Sullivan can demonstrate that the CIA has failed to provide adequate due process to remedy those deprivations. By virtue of these arguments, the CIA has deprived Sullivan of his rights under the Fifth Amendment. Therefore, its' Motion should be denied without prejudice until after discovery has been completed.

### A. Sullivan Can Demonstrate That He Was Deprived Of A Protected Liberty Interest

There is no dispute that in order to establish a liberty interest claim, a plaintiff must first show that the government negatively altered his employment status "in a tangible

way". <u>Krc</u>, 905 F.2d at 397. It is similarly undisputed that the plaintiff must demonstrate

that the government's conduct also:

> stigmatizes the employee or impugns his reputation so as to either (1) seriously damage his standing and associations in his community ("reputation-plus"), or (2) forecloses his freedom to take advantage of other employment opportunities by either (a) automatically excluding him from a definite range of employment opportunities within the government or (b) broadly precluding him from continuing his chosen career ("stigma or disability").

<u>M.K. v. Tenet</u>, 196 F. Supp. 2d 8, 15 (D.D.C. 2001). Lastly, the plaintiff must also

demonstrate that the deprivation occurred without the government providing adequate

due process. <u>See</u> <u>Doe v. Cheney</u>, 885 F.2d 898, 910 (D.C. Cir. 1989).

Sullivan can demonstrate a tangible change in status in relation to the four separate

circumstances identified in the FAC, namely that: 1) he was denied employment with the

Clandestine Service Reserve Cadre due to the CIA's reliance upon inaccurate and

derogatory information; 2) he lost his job offer from Raytheon Company by way of the

CIA's dissemination of inaccurate information concerning Sullivan's clearance

eligibility; 3) he was automatically excluded for several months from a definite range of

employment opportunities that are only offered at job fairs to individuals with an active

security clearance; and 4) that he has been broadly precluded from pursuing his chosen

career by virtue of the fact that the CIA continues to maintain inaccurate and derogatory

information pertaining to him in its records. FAC at ¶38(a)-(d).

This Circuit has adhered to the policy that "there are several ways in which the

government may cause a change in status, including discharging the employee,

foreclosing the employee's future employment opportunities, or reducing the employee's

rank or pay." <u>Ranger</u>, 274 F. Supp. 2d at 7, <u>quoting</u> <u>Doe v. Casey</u>, 796 F.2d 1508, 1523

(D.C. Cir. 1986). <u>See</u> <u>also</u> <u>Mosrie v. Barry</u>, 718 F.2d 1151, 1161 (D.C. Cir. 1983)

("foreclosure of a right to be considered for government contracts in common with all other persons" sufficient to demonstrate change in status). In the end, all that is necessary is that the plaintiff is initially able to demonstrate that the government action "so severely impaired one's ability to take advantage of a legal right … that the government can be said to have 'foreclosed' one's ability to take advantage of it". <u>Id</u>. at 1161.

The CIA argues that Sullivan's loss of the CIA and Raytheon employment opportunities and temporary exclusion from cleared job fairs due to the initial denial of his security clearance did not constitute a tangible change in status. Defs' Memo at 24. In fact, "a federal agency's revocation [or denial] of a security clearance may give rise to a due process claim for injury to a liberty interest in reputation." <u>Ranger</u>, 274 F.Supp.2d at 7, <u>citing</u> <u>Casey</u>, 796 F.2d at 1522. The CIA relies upon the D.C. Circuit's ruling in <u>Krc</u> that "loss of some employment opportunities" by way of modification of a security clearance does not constitute a tangible change in status. <u>Id</u>. 905 F.2d at 397. The CIA's interpretation of the scope of the <u>Krc</u> ruling is considerably broader than the facts of that case suggest is appropriate, given that in <u>Krc</u> the plaintiff's "loss of 'some' employment" consisted merely of being removed from one position with an agency and subsequently being reinstated with the very same agency the very next day in a different position with a pay increase. <u>Id</u>. at 397. Furthermore, at no point in that case was the plaintiff's security clearance revoked or suspended. <u>Id</u>. To construe the ruling that emerged from that set of facts and argue that Sullivan's loss of two identifiable employment opportunities and his exclusion from a host of potential employment opportunities available at the job fairs by virtue of the CIA's initial denial of his security clearance is somehow comparable defies credulity and logic.

1.   *Sullivan Can Demonstrate An Actionable "Reputation-Plus" Claim*

In order to claim an actionable "reputation-plus" harm, the plaintiff must be able to demonstrate that the agency made "public accusations that will damage [the plaintiff's] standing and association in the community" in connection with the change in status. Doe, 885 F.2d at 910. The CIA seeks to rely upon Molerio v. FBI as support for the idea that dissemination of information concerning a security clearance denial can not amount to the kind of "public" dissemination required for Fifth Amendment purposes. Defs' Memo at 25, citing Molerio, 749 F.2d 815, 824 (D.C. Cir. 1984). See also Doe, 885 F.2d at 910 (no public dissemination when plaintiff had consented to NSA disseminating information and dissemination was conducted with clear limits on further distribution).

The CIA's reliance upon Molerio is arguably misplaced for in that case the plaintiff failed to identify the specific grounds for denial that implied "disloyalty or any other repugnant characteristic". Id. at 824.[9] In situations in which the plaintiff can identify specific government determinations that implicate the plaintiff's honesty and integrity, public dissemination of that information is sufficient for purposes of the "reputation-plus" prong. See e.g. Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d 953, 966 (D.C. Cir. 1980)(branding a contractor as lacking integrity implicates a liberty interest); Rolles v. Civil Service Commission, 512 F.2d 1319 (D.C. Cir. 1975) (accusations of dishonesty sufficient to implicate a liberty interest).

---

[9] Although the CIA does not clearly articulate it as a supplemental argument one way or the other, the precedent in Molerio and Doe also fail to provide support to the idea that there was no actual "public" dissemination of the defamatory information. In Molerio, the dissemination was exclusively within the FBI, 749 F.2d at 824, and in Doe the plaintiff consented to dissemination outside of the NSA. 885 F.2d at 910. In contrast, the CIA's dissemination here was both outside of the CIA and the federal government as a whole and was done without Sullivan's permission.

In Sullivan's case while the CIA would arguably be correct in stating that public dissemination of the denial of Sullivan's security clearance in and of itself does not suffice for purposes of the "reputation-plus" prong, see Defs' Memo at 25, the CIA's dissemination of inaccurate facts that he was ineligible for a clearance – which is a negative stigma - implicates Sullivan's honesty and integrity and thereby "passes judgment" on Sullivan's character. This specific conduct satisfies the "public dissemination" component of the "reputation-plus" prong.

As a last line of defense, the CIA tries to interpret the M.K. ruling out of context by arguing that "loss of a security clearance and termination of employment" does not "sufficiently damage a plaintiff's reputation" for Fifth Amendment purposes. Defs' Memo at 25-26, quoting M.K., 196 F. Supp. 2d at 15. However, the CIA neglects to completely and accurately recite the ruling, which stated that the loss of a security clearance and termination of employment did not sufficiently damage a plaintiff's reputation *unless* it was combined with public accusations that damaged the plaintiff's standing and associations in the community. Id. (emphasis added). As Sullivan has already demonstrated the existence of public accusations that damaged his standing, the ruling in M.K. does nothing to undermine Sullivan's claim that he has been deprived of a liberty interest with regards to the employment opportunity that was rescinded by Raytheon due to the inaccurate information disseminated by the CIA pertaining to Sullivan's security clearance eligibility.

2. *Sullivan Can Demonstrate An Actionable "Stigma" Claim*

In order to claim an actionable "stigma or disability" harm, the plaintiff must be able to demonstrate that the federal agency's conduct has had the "broad effect of precluding [the employee] from pursuing [their] chosen career." Kartseva v. Dep't of State, 37 F.3d 1524, 1528 (D.C. Cir. 1994)(alterations in original). See also Greene v. McElroy, 360 U.S. 474, 492 (1959)("Revocation of a security clearance possibly implicates a Fifth Amendment liberty interest where action has seriously affected, if not destroyed, plaintiff's ability to obtain employment [in his chosen career.]").

Sullivan has asserted that the CIA continues to maintain inaccurate and derogatory information in its records pertaining to him which effectively leave him at the mercy of the CIA. Any attempt by Sullivan to obtain future employment in his chosen profession that requires, at a minimum, information from the CIA pertaining to Sullivan or, at worst, information pertaining to Sullivan's eligibility for a security clearance will be subject to the whims of the CIA official who is responsible for disseminating that information. The CIA's attempt to undermine this argument by noting that Sullivan's security clearance was eventually granted pays no attention to the fact that Sullivan has claimed inaccurate or derogatory information still remains in the records maintained by the CIA pertaining to Sullivan and blithely ignores the reasonable likelihood that the information will cause a disruption in Sullivan's future employment opportunities.[10] See Old Dominion, 631 F.2d at 966 n.24 ("In the present case, the determination that Old Dominion lacked integrity

---

[10] The facts in Ranger are similar to that asserted by Sullivan. Judge Collyer, in denying the CIA's Motion to Dismiss, noted that it is unclear "what information regarding the revocation of Mr. Ranger's security clearance has been, or might be, released outside the CIA and what effect that might have on his standing in the community." 274 F.Supp.2d at 9. Additional facts were necessary for the Court to render a judgment as to whether the CIA's disclosure of information to third parties was stigmatizing to the plaintiff.

had already been communicated through Government channels and would undoubtedly have been recommunicated every time ODDPI bid on a subsequent contract.").

The D.C. Circuit's holding in <u>Mazaleski v. Treusdell</u>, 562 F.2d 701, 713 (D.C. Cir. 1977), can not serve as a source of support for the argument that the initial denial of Sullivan's security clearance at worst only creates a "mere disadvantage or impediment" to his retention of future employment, or that it does not sufficiently infringe upon his liberty interest. The <u>Mazaleski</u> holding merely construed the Supreme Court's <u>Roth</u> decision as concluding that an unfavorable personnel action in and of itself - and based on issues of job performance or other reasons not otherwise tied to the honesty or integrity of the plaintiff – would at most merely pose an impediment to future employment opportunities and therefore could not constitute a deprivation of a liberty interest. <u>Mazaleski</u>, 562 F.2d at 714 ("Appellant was not terminated for dishonesty, for having committed a serious felony, for manifest racism, for serious mental illness, or for lack of 'intellectual ability, as distinguished from his performance . . . .' Whereas dismissals for these reasons have been held to affect liberty, dismissals for reasons similar to those given in appellant's case have generally been deemed not to touch a liberty interest."). <u>See</u> <u>also</u> <u>Roth</u>, 408 U.S. at 573 (finding that deprivation of a liberty interest can exist when a person's "good name, reputation, honor, or integrity" is at stake).

> **B. Sullivan Has Not Been Afforded Adequate Due Process, As The CIA Has Failed To Provide Notice Whether The Information Relied Upon Has Been Deemed Inaccurate And, If So, If It Has Been Corrected**

The amount of due process that agencies are required to afford to an individual deprived of a liberty interest in order to avoid running afoul of the Fifth Amendment has

never been quantified but it is generally agreed that what is necessary is that the individual be afforded an opportunity to be heard at a meaningful time and in a meaningful manner. See Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 208 (D.C. Cir. 2001). The fact that Sullivan was permitted to appeal the initial denial of his security clearance – concerning which he was ultimately successful – does not satisfy the CIA's obligations under the Fifth Amendment for the simple reason that the process afforded did not address the underlying problem that proximately caused the deprivation. To be sure, Sullivan was permitted to submit a written refutation addressing what he viewed as the inaccurate and derogatory information upon which the CIA relied in concluding that Sullivan had committed security violations and had engaged in questionable personal conduct, conclusions which served as the proximate and indeed exclusive cause for the initial denial of Sullivan's security clearance. Ex. A. to Tormey Decl.; Ex. B. to Tormey Decl. However, the mere fact that the CIA reversed its initial denial is not the equivalent of the CIA agreeing that the challenged information was, in fact, inaccurate. The basis for the CIA's reversal is unknown. For all Sullivan and this Court knows, the same inaccurate and derogatory information remains openly available within the CIA's records and will be further disseminated. Sullivan has yet to have cleared his name, and is entitled to additional due process under Cheney, 885 F.2d at 910.

The CIA's invocation of the D.C. Circuit's statement in Casey, 796 F.2d at 1524, that "[i]n the context of a very sensitive agency such as the CIA, we cannot say that the Constitution requires more", is inapposite. The Court's statement was made in the context of the CIA's refusal to disclose to plaintiff the basis upon which it viewed his homosexuality as a security risk. Id. In contrast, Sullivan is already aware of the specific

fact-based findings that justified the initial denial of his security clearance, but he has not been provided with any explanation as the basis upon which the CIA chose to reverse its initial decision and grant him the security clearance. Unlike in <u>Doe</u>, where the issue was not the accuracy of the information underlying the finding but rather the basis for the Office of Security's determination that plaintiff's homosexuality posed a security risk, in the case of Sullivan the accuracy of the information is at the heart of the matter. Sullivan has not been provided with any manner of notice whether the CIA recognized that the information was inaccurate, thereby resulting in the reversal, nor with any assurances that the inaccurate information has been modified or otherwise corrected so as to ensure against a recurrence of this problem. FAC at ¶24.

Finally, the CIA's assertion that Sullivan failed to request a name-clearing hearing is simply absurd. Sullivan's written response was submitted in anticipation of a "personal appearance" hearing to address the initial denial. The CIA can not dispute, in fact, that Sullivan explicitly requested a personal appearance, i.e., name clearing hearing. Its own letter acknowledges this to be the case. Exhibit "3". That the CIA chose to reverse its' decision without further explanation, and deny Sullivan the right for confrontation, does not relieve it of its obligation to afford Sullivan adequate due process. <u>See</u> <u>Cheney</u>, 885 F.2d at 910.

### C.  At A Minimum, Sullivan Is Entitled To Discovery On His Fifth Amendment Claim Before The CIA Deserves Dismissal Of This Case

The leading case in this Circuit involving a Fifth Amendment liberty interest and federal employment is <u>Kartseva</u> where it was argued that her discharge from employment as a Russian translator excluded her from future employment in her chosen career.

37 F.3d at 1526. The Court of Appeals reversed the District Court's dismissal in order to first allow discovery to take place so that <u>at least</u> three important questions could be resolved:

> (1) the scope of State's express disqualification  - in particular, whether State's internal recommendations that Kartseva "not secure a position in support of any Department of State contract," refers only to the Statistica contract from which Kartseva was removed, to all Statistica contracts with State, or, indeed, to *any* State contract; (2) the extent to which State's action as to Kartseva would normally be available to and would legally affect other government agencies or private employers in their decisions whether to employ her or permit her to work on government contracts; and (3) the extent to which the disqualification will affect Kartseva's ability to pursue her vocation as a Russian translator.

<u>Id</u>. at 1530 (emphasis original). <u>See also</u> <u>Orange v. District of Columbia</u>, 59 F.3d 1267, 1275 (D.C. Cir. 1995)(discovery permitted to prove Fifth Amendment Constitutional claims); <u>Hogue v. Clinton</u>, 719 F.2d 1318, 1321 (8th Cir. 1986)(bench trial permitted on plaintiffs' Constitutional claims); <u>Bailey v. Kirk</u>, 777 F.2d 567, 569 (10th Cir. 1985) (depositions permitted on Fifth Amendment claims).

The <u>Kartseva</u> questions are similar, if not identical, to some of those that must be answered in this case: (1) what is the scope of the CIA's dissemination of inaccurate and/or unfavorable information concerning Sullivan?; (2) to what extent is this information available to other government agencies or private employers?; (3) to what extent do the CIA's actions foreclose Sullivan from pursuing his vocation; and (4) what regulations, rules or policies specifically applied to Sullivan's situation? Each of these questions is proper for discovery and should be answered prior to any contemplation of

dismissal of this action.[11] See also Ranger, 274 F.Supp.2d at 8-9 (CIA's Motion to Dismiss denied on Fifth Amendment claim as additional facts necessary).

## IV.   SULLIVAN'S APA CLAIM CHALLENGING THE CIA'S SECURITY CLEARANCE PROCEDURES SHOULD NOT BE DISMISSED

### A.  Sullivan's APA Claim Does Not Fail For Lack Of Standing Or Mootness

As it did with Sullivan's First Amendment claim, the CIA similarly seeks to narrowly construe the requirements for standing to seek declaratory relief with respect to Sullivan's APA claim. Defs' Memo at 29-30. The CIA again argues that the claim is moot as "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." Id. at 30, quoting Munsell v. Dep't of Agriculture, 509 F.3d 572, 583 (D.C. Cir. 2007).

While it is undisputed that a requirement for standing to seek declaratory relief is that the plaintiff is able to show a "real and immediate threat" of being subjected to the same

---

[11] Furthermore, both Sullivan and Kartseva named unnamed government employees as defendants. See FAC at passim; Kartseva, 37 F.3d at 1530. The Court of Appeals in Kartseva reversed the District Court's dismissal of the Bivens claims against the unnamed defendants because the threshold "'essential legal question whether the conduct of which the plaintiff complains violated clearly established law,'" was never decided. Id. (citation omitted). The Court elaborated that:

> [w]here, as here, the resolution of the threshold question of the existence of a clearly established constitutional right requires information on the nature and effects of the government action that is exclusively within the domain of the government, limited discovery may be appropriate to determinate that threshold issue.

Id. Although the issue of the individual unnamed defendants are not yet before this Court (as the unknown defendants remain just that until discovery), discovery against the primary agency defendants would overlap with the individual defendants. Additionally, the plaintiff in Doe v. United States Dep't of Justice, 753 F.2d 1092 (D.C. Cir. 1985), survived a similar Motion to Dismiss. Id. at 1102 ("Doe's discharge amidst the allegations of unprofessionalism implicates a constitutionally protected liberty interest in reputation and that, if those allegations were publicly disclosed, she is entitled to an opportunity to clear her name.") The D.C. Circuit seems to comment in dicta that discovery should have been permitted by the District Court so the record would not be as sparse on appeal. Id. at 1098.

alleged illegal harm again and that the feared harm is "certainly impending", see Defs' Memo at 29, the CIA continues to operate upon the flawed premise that the reversal of the initial denial of Sullivan's security clearance erased any threat that Sullivan will be subject to a future denial of his security clearance in the same manner. It is with that mistaken assumption in mind that the CIA asserts that the entire claim is moot as presumably Sullivan's rights will not be affected regardless of whether the APA claim is adjudicated in his favor. Id. at 30.

To the contrary, Sullivan has already demonstrated that, given the insufficiency of available evidence in the record, it is premature to conclude that Sullivan can not demonstrate that there are "continuing, present adverse effects" that are likely to cause a recurrence of the "inappropriate and unlawful" security clearance denial. See Lyons, 461 U.S. at 102-3; Matthews, 521 F. Supp. 2d at 82. The CIA has yet to disclose, among other things: (1) whether it acknowledges the information that Sullivan challenged was inaccurate and incomplete; (2) whether the CIA has amended or modified its records pertaining to Sullivan in order to accurately reflect that Sullivan did not commit security violations or engage in questionable personal conduct; and/or (3) whether the criticisms in Gatekeeper had any undue influence on the security clearance process.

In light of those facts Sullivan's APA claim is not moot as his situation falls within the "capable of repetition yet evading review" exception to the mootness doctrine, as well as serves to  have "continuing, present adverse effects". See Friends of the Earth, Inc., 528 U.S. at 174; Pharmachemie B.V., 276 F.3d at 631-32; Burlington Northern Railroad Co., 75 F.3d at 690. Accordingly, the CIA's Motion to Dismiss should be dismissed at this early stage.

**B. Sullivan's APA Claim Challenges the Procedures Utilized By The CIA In Processing The Security Clearance, Not The Decision Itself, And Therefore Is Not Committed To Agency Discretion By Law**

The CIA's assertions aside, Sullivan's APA claim is not challenging the substance of the initial denial of his security clearance but rather the procedures and methods utilized in effectuating the polygraph examination and the security clearance process as a whole. See e.g. FAC at ¶66 ("Their actions fell outside acceptable parameters and standards of appropriate conduct as set forth by, but not limited to, the Department of Defense Polygraph Institute and the American Polygraph Association to such an extent as to unfairly taint the examinations."); Id. at ¶67 ("The CIA has engaged in, and continues to engage in, an unlawful and/or flawed process with respect to the utilization of polygraph examinations."); Id. at ¶72 ("[c]onducting an improper polygraph examination and unfairly relying on the results of the polygraph examination …").

These types of challenges are not committed by law to the discretion of the CIA. As with its arguments pertaining to Sullivan's Privacy Act and First Amendment claims, the CIA can not produce even one binding case that supports the argument that Sullivan's APA challenge is not subject to judicial review. Instead, it cites once again to cases in which the plaintiff was seeking to challenge the actual merits of the final agency determination. See e.g. Webster, 486 U.S. at 601 (ultimate determination regarding whether the circumstances justified termination not reviewable under APA); Krc, 905 F.2d at 397 (ultimate determination regarding termination of a Foreign Service Officer not reviewable under APA).

These decisions have little to no bearing on Sullivan's APA claim as he is not attempting to challenge the merits of the ultimate decision to deny his security clearance

but rather whether the methods and procedures utilized in reaching that ultimate

determination were in compliance with the CIA's own internal regulations. Indeed, it is

well-established that the failure of an agency, even one that operates shrouded in secrecy,

to adhere to its own regulations can be challenged under the APA. See e.g., Webster,

486 U.S. at 602 n.7 ("We understand that petitioner concedes that the Agency's failure to

follow its own regulations can be challenged under the APA as a violation of § 102(c).");

Service v. Dulles, 354 U.S. 363 (1957)(recognizing right of federal courts to review

agency's actions to ensure own regulations have been followed).

Accordingly, the CIA's argument that Sullivan's APA claim is not subject to judicial

review should fail.

### C. The CSRA Has No Bearing On Sullivan's APA Claim

As with Sullivan's Privacy Act claims, the CIA attempts to portray Sullivan's APA

claim in the context of a challenge to the denial of employment with the CIA that is

thereby precluded by the CSRA. Defs' Memo at 31. For reasons similar to those

described above, since Sullivan's APA claim is confined exclusively to challenging the

lawfulness of the methods and procedures used by the CIA during the polygraph

examination in particular and the security clearance proceedings as a whole, the CSRA

has no bearing on Sullivan's claim.

The D.C. Circuit's ruling in Graham v. Ashcroft, 358 F.3d 931 (D.C. Cir. 2004) -

although at first seeming to indicate that APA claims alleging violations of internal

agency regulations are precluded by the CSRA - does not, in fact, provide the CIA with

support. In Graham, the Circuit held that an APA claim challenging an agency's failure to

adhere to internal regulations limiting the agency's discretion regarding adverse actions –

such as issuing a letter of censure – could be precluded by the CSRA. Id. at 935, citing

United States v. Fausto, 484 U.S. 439, 441-443 (1988). This ruling, while relevant in

circumstances implicating an agency's discretion regarding an adverse personnel action,

has no bearing on Sullivan's situation. As the Supreme Court noted in Egan, which the

CIA itself heavily relies upon, security clearance proceedings do not constitute "adverse

actions" within the statutory scope of the CSRA and therefore are not subject to its

preclusive restrictions on other statutory remedies. Id. 484 U.S. at 530.

Accordingly, the CIA's argument that Sullivan's APA claim is precluded by the

CSRA should fail.

### D.  Both The Denial Of Sullivan's Security Clearance And Its Reversal Constitute "Final Agency Decisions" For Purposes Of An APA Claim

It is undisputed that the APA confines judicial review to agency actions that are

"final", 5 U.S.C. § 704, and that determining whether an agency action is "final" consists

of evaluating whether the agency has completed its decisionmaking process, "and

whether the result of that process is one that will directly affect the parties." Franklin v.

Massachusetts, 505 U.S. 788, 797 (1992). See also Ciba-Geigy Corp. v. EPA, 801 F.2d

430, 436 (D.C. Cir. 1986)(agency action is "final" when agency views deliberative

process as sufficiently final to demand compliance with announced position). Agency

action is not considered final if it is only the "ruling of a subordinate official" or is

"tentative". Franklin, 505 U.S. at 797, quoting Abbott Laboratories v. Gardner, 387 U.S.

136, 151 (1967). See also Her Majesty The Queen v. EPA, 912 F.2d 1525, 1531 (D.C.

Cir. 1990)("When an agency position is merely tentative, judicial intervention may deny

the agency an opportunity to correct its own mistakes and to apply its expertise and leads

to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary.")(internal quotations omitted).

The CIA's assertions notwithstanding, the fact that the denial of Sullivan's security clearance was later reversed does not by necessity require a determination that the denial was merely "tentative". Indeed, as the CIA has noted several times, the basis for the processing of Sullivan's security clearance was in order for him to secure employment at the CIA.[12] If the denial of Sullivan's security clearance was not a "final" action, then by necessity Sullivan should not have immediately been rejected for the position with the Clandestine Service Reserve Cadre. Instead, if the action was truly "tentative" by virtue of it being subject to appeal, then the ultimate decision to reverse the initial denial and grant Sullivan his security clearance should have resulted in an offer of employment or, at a minimum, reconsideration of the decision to reject his application. The reality of the situation remains, however, that the moment that the CIA denied Sullivan's security clearance, it "demanded compliance with its announced position", namely the rejection of Sullivan's application for employment by virtue of his inability to obtain a security clearance. Such action typifies the idea of something that is "final". See Zaid Decl. at ¶¶6-7.

Accordingly, the CIA's argument that Sullivan can not identify a "final" agency action should not succeed.

---

[12] This does not constitute a concession by Sullivan that his Privacy Act or APA claims should therefore be considered as challenges to the final agency determination to reject his employment and thereby fall within the scope of the CSRA. Sullivan continues to maintain that his Privacy Act claim is narrowly confined to the unlawful dissemination of inaccurate information and that his APA claim is restricted to challenging the CIA's failure to comply with its own regulations regarding the methods and procedures used in polygraph examinations and the security clearance process as a whole.

## V.  THE DEFENDANT AGENCIES' DISCLOSURE OF SULLIVAN'S SOCIAL SECURITY NUMBER VIOLATED THE PRIVACY ACT

The Privacy Act was enacted, among other reasons, because "the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal Agencies" and "the right to privacy is a personal and fundamental right protected by the Constitution of the United States...." 88 Stat. 1896 (1974).

Notwithstanding repeated threats from the defendants to seek Rule 11 sanctions against his counsel, Sullivan is pursuing several Privacy Act claims against the CIA and DOJ for disclosing his personal information – most notably his SSN – by filing certain documents pertaining to his security clearance processing as part of the open court record.[13] Let it be clear – the challenge is not to the disclosure of the broader documents but to the specific privacy protected information as represented by the SSN which could have been, and should have been as a matter of law and agency practice, easily redacted prior to filing.

Three distinct disclosures occurred in this case: (1) the CIA disclosed Sullivan's SSN to the DOJ; (2) the CIA, through its agent, disclosed Sullivan's SSN by filing it on the public record; and (3) the DOJ disclosed Sullivan's SSN by filing it on the public record. Without addressing one way or the other as to whether (1) was permitted by a routine use exception, Sullivan does not challenge the transfer of the SSN between agencies. The

---

[13] Not surprisingly the defendants revealed to this Court only selected portions of the factual record that pertained to these claims. In response to the threats from DOJ Sullivan's counsel, without any obligation to do so, openly laid out his legal and factual reasoning underlying these claims and invited the defendants to respond in order to justify their allegations of frivolity. They chose not to do so. The complete substantive correspondence is attached for the record hereto. Zaid Decl., at Exhibits "A" – "I".

primary contested issue is the public filing with this Court of Sullivan's SSN. Through

(2) and (3) are the same act, as a matter of both fact and law they give rise to overlapping

independent claims, and both federal agencies bear responsibility for their individual

actions.

### A. At No Time Did Sullivan Ever Place His Social Security Number, Which Alone Constitutes A Record Under the Privacy Act, At Issue In This Litigation

There can be no dispute that Sullivan did not authorize the CIA/DOJ to publicly

disclose his SSN. Sullivan Decl. at ¶13; FAC at ¶34. SSNs have a very special and

important place in our society. Indeed, Congress specifically recognized the dangers of

widespread dissemination of social security numbers when it enacted the Privacy Act. A

primary impetus for the legislation was to "curtail the expanding use of social security

numbers by federal and local agencies and, by so doing, to eliminate the threat to

individual privacy and confidentiality of information posed by common numerical

identifiers." Doyle v. Wilson, 529 F. Supp. 1343, 1348 (D. Del. 1982), citing S. Rep. No.

93-1183 (1974), reprinted in 1974 U.S.C.C.A.N. 6916, 6944.[14]

Since the enactment of the Privacy Act, concerns over the use of social security

numbers as widespread identifiers has increased exponentially. See Greidinger v. Davis,

988 F.2d 1344, 1353 (4th Cir. 1993). In fact, the Fourth Circuit identified numerous

---

[14] The Privacy Act specifically addresses the use and disclosure of social security numbers. It is unlawful for any federal, state or local government agency to deny any individual any right, benefit or privilege provided by law because the individual refused to disclose his or her social security number. See Pub. L. No. 93-579, § 7(a)(1), 88 Stat. 1895, 1909, codified at 5 U.S.C.A. § 552a Historical And Statutory Notes (West 1996). The Act also requires that any government agency which requests an individual to disclose his social security number must state whether the disclosure is mandatory or voluntary, by what statutory authority the number is being solicited, and what uses will be made of the number. Id.

examples of the devastating impact that the disclosure of one's social security number

can bring. Id. at 1353-1354 (citing newspaper articles). See also "Identity Theft Gets

Personal", *Washington Post*, January 13, 2008 at F1 (noting President Bush established

task force to combat identity theft which recommended reducing unnecessary use of

Social Security numbers by federal agencies, and that lawmakers have introduced

additional legislation to protect Social Security numbers); "Online Records May Aid ID

Theft", *Washington Post*, January 2, 2008 at A1 (discussing concerns surrounding SSNs

in judicial records).

Most importantly, there also can be no dispute that Sullivan's SSN *alone* constitutes a

record as defined by the Privacy Act, particularly given the sensitivity surrounding SSNs.

A "record" may be "any item, collection, or grouping of information about an

individual." 5 U.S.C.A. § 552a(a)(4). In fact, the Fourth Circuit has held that a "record"

under the Act includes as little as one descriptive item about an individual. Williams v.

Department of Veterans Affairs, 104 F.3d 670, 674 (4th Cir. 1997).[15]

The significance of SSNs and the protection that the Privacy Act affords them

especially was addressed in a serious of decisions that ultimately resulted in the first

Privacy Act case to be decided by the Supreme Court. See Doe v. Herman, 1999 U.S.

Dist. LEXIS 17302 (W.D.Va. Oct 29, 1999)(magistrate's recommendation), adopted in

pertinent part & rev'd in other part, 2000 WL 34204432 (W.D. Va. July 24, 2000), aff'd

in part, rev'd in part, & remanded, on other grounds sub nom. Doe v. Chao, 306 F.3d 170

---

[15] In evaluating subsection (b)(3) of the Act, one district court has held that a plaintiff
may choose which particular "item of information" contained within a "collection or
grouping of information" disclosed is a "record" and challenge it as wrongfully disclosed.
Covert v. Harrington, 667 F. Supp. 730, 736-37 (E.D. Wash. 1987), aff'd on other
grounds, 876 F.2d 751 (9th Cir. 1989).

(4th Cir. 2002), aff'd, 540 U.S. 614 (2004). The underlying case dealt with very similar facts surrounding a federal agency disclosing SSNs in public administrative proceedings without written consent under an alleged routine use. While the lawsuit took almost a decade to resolve, the issue of liability was barely litigated as it was determined early on that the government had unlawfully disclosed the SSNs. The litigation eventually centered on the issue of damages and the proof that was required for financial recovery. Ultimately, even though the majority of the plaintiffs failed to recover any damages, the attorneys for Doe were granted attorney's fees for having substantially prevailed on an important public issue. Doe et al. v. Chao, 346 F.Supp.2d 840 (W.D. Va. 2004), aff'd in part, 435 F.3d 492 (4th Cir. 2006), on remand, 2006 U.S. Dist. LEXIS 49033 (W.D.Va. July 19, 2006).

**B. The Public Disclosure By The CIA And DOJ Of Sullivan's SSN Did Not Fall Within An Established Routine Use Exception**

The Act's legislative history indicates that "a court is not defined as an 'agency' nor is it intended to be a 'person' for purposes of [the Privacy Act]," and that the Act was "not designed to interfere with access to information by the courts." 120 Cong. Rec. 36,967 (1974). However, the public filing of records with a court, during the course of litigation, does constitute a subsection (b) disclosure. See Laningham v. United States Navy, No. 83-3238, slip op. at 2-3 (D.D.C. Sept. 25, 1984), summary judgment granted (D.D.C. Jan. 7, 1985), aff'd per curiam, 813 F.2d 1236 (D.C. Cir. 1987). Therefore, any such public filing must be undertaken with written consent or pursuant to either the subsection (b)(3) routine use exception or the subsection (b)(11) court order exception. The only issue here is whether the CIA/DOJ's actions fell within their respective "routine use" exceptions.

The Privacy Act defines "routine use" of a record as "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C.A. § 552a(a)(7). "In common usage, the word 'compatible' means simply 'capable of existing together without discord or harmony.'" <u>U.S. Postal Service v. National Association of Letter Carriers</u>, 9 F.3d 138, 144 (D.C. Cir. 1993)(citation omitted). Congress intended that the routine use exception "should serve as a caution to agencies to think out in advance what uses it (sic) will make of information." *Analysis for House and Senate Compromise Amendments to the Federal Privacy Act, reprinted in* 120 Cong.Rec. 40,405, 40,406 (1974).

The CIA's general routine uses (which are applicable to all systems of records maintained by the CIA) arguably permits the CIA to disclose records in the course of presenting information and evidence to a court. <u>See</u> 70 Fed. Reg. 42418 (July 22, 2005)(Routine Use #11). The DOJ's Civil Division, in turn, has a routine use allowing it to disclose "arguably relevant" records to a court in litigation when it is representing an agency. <u>See</u> 63 Fed. Reg. 8659, 8665-66 (February 20, 1998), 66 Fed. Reg. 36593-94 (July 12, 2001). Both agencies continue to seize upon the mistaken notion that what is being challenged is their disclosure of the broader records, but that is not the case. The issue is whether the CIA/DOJ's routine uses permitted them, both individually and collectively, to publicly disclose Sullivan's SSN. Thus, the defendants' exclamation that their "inadvertent failure to redact a social security number (or any other particular personal details) from one of the documents before filing does not somehow concert these routine uses into Privacy Act violations", Defs' Memo at 35, mixes apples and

oranges. It is the absence of an applicable routine use permitting the public disclosure of Sullivan's SSN that converts their actions into a Privacy Act violation.

It is well-established that agencies covered by the Privacy Act "may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act," Doe v. Stephens, 851 F.2d 1457, 1466 (D.C. Cir. 1988), and that the "scope of [a] routine use is confined to the published definition." See Covert, 876 F.2d at 757; Doe v. Naval Air Station, Pensacola, Fla., 768 F.2d 1229, 1231 (11th Cir. 1985). See e.g., Wisdom v. Department of Housing and Urban Development, 713 F.2d 422, 424 (8th Cir.), cert. denied, 465 U.S. 1021 (1983); Parks v. IRS, 618 F.2d 677, 681-82 (10th Cir. 1980). See also Andrews v. Veterans' Administration of the United States, 613 F.Supp. 1404, 1413 (D.Wyo. 1985) ("Any regulations enacted under the Privacy Act must be consistent with its purposes, and inconsistent regulations are invalid, and will not justify release of covered information"); But cf. Tijerina v. Walters, 821 F.2d 789, 795 (D.C. Cir. 1987)(construing provisions of Privacy Act allowing agencies to exempt themselves from Act's civil remedies section to extend only so far as they do not "contravene the language of the Act and the purpose behind the general exemptions provision"). In other words, a particular disclosure is unauthorized if it does not fall within the clear terms of the routine use.

"The key operating concept of the Privacy Act is that individual rights must be recognized and balanced in agency uses of information." Doe v. DiGenova, 779 F.2d 74, 84 (D.C. Cir. 1985), quoting J. O'Reilly, *Federal Information Disclosure* 20-22 (1985). It remains this Court's obligation to "find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." Commissioner of Internal Revenue

v. Engle, 464 U.S. 206 (1984)(quotation omitted). Congress intended the Act to "limit the kind of information that can be collected or disclosed and imposes a standard of quality and diligence on the maintenance of government records." Ely v. Department of Justice, 610 F.Supp. 942, 945 (N.D. Ill. 1985). CIA/DOJ's actions fail to meet the necessary standard and they should be held accountable.

More to the point, in fact, an individual's SSN is closely guarded by the government and disclosure can occur in only a very limited number of exceptions. See Romero-Vargas v. Shalala, 907 F.Supp. 1128 (N.D. Ohio 1995)(disclosure by agency of plaintiffs' social security numbers to employer violated the Privacy Act as it was not within routine use exception). Privacy rights have also been recognized for home addresses and telephone numbers. See Naval Air Station, Pensacola, Florida, 768 F.2d at 1232 (disclosure by Naval Investigative Service of plaintiff's home address and telephone number to County Sheriff's Office was not routine use of information and violated Privacy Act).[16]

Whether an agency can invoke its routine use exception to publicly file records in court, as a general rule, has at times been a controversial topic. The Act's legislative history does recognize that there can be some level of "compatibility" of this type of disclosure. See 120 Cong. Rec. 40,405, 40,884 (1974). In Krohn v. United States

---

[16] The Supreme Court has noted that even though "home addresses often are publicly available through sources such as telephone directories and voter registration lists, [] 'in an organized society, there are few facts that are not at one time or another divulged to another.' ... The privacy interest protected ... 'encompasses the individual's control of information concerning his or her person.' ... An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form." United States Department of Defense et al. v. Federal Labor Relations Authority et al., 510 U.S. 487, 500 (1994).

Department of Justice, No. 78-1536, slip op. at 4-7 (D.D.C. Mar. 19, 1984), the Court invalidated an FBI routine use allowing for "dissemination [of records] during appropriate legal proceedings," finding that such a routine use was impermissibly "vague" and was "capable of being construed so broadly as to encompass all legal proceedings." In response to Krohn, OMB issued a suggested model routine use that employed a "relevant and necessary to the litigation" standard. OMB Memorandum for the Senior Agency Officials for Information Resources Management 2-4 (May 24, 1985)(unpublished). Many agencies adopted "post-Krohn" routine uses and that would presumably include the routine uses at issue in this litigation.

Notwithstanding the position that the documents that were filed were relevant to this litigation, Sullivan's SSN was most certainly not. See Herman, 1999 U.S. Dist. LEXIS 17302, *33 ("The use and dissemination of a claimant's social security number has no relation to the public proceedings of determining black lung eligibility"). Nor dos the CIA/DOJ's routine uses provide any conception to an individual that these agencies will publicly release SSNs. The Privacy Act clearly indicates that when an agency solicits a SSN it shall inform the individual of what use will be made of it. 5 U.S.C. § 552a(e)(3)(B)-(C). Neither the CIA or DOJ can point to any evidence that it informed Sullivan of this intended use of his SSN. See Herman, 1999 U.S. Dist. LEXIS 17302, *37 (agency's routine use list "does not contain any mention of the disclosure of claimants' social security numbers to uninterested parties on multi-captioned hearing notices or to the public at large in compilations of black lung opinions").

Thus, the disclosure of his SSN does not satisfy the "compatibility" requirement of subsection (a)(7) of the Act or fall within the CIA/DOJ's routine use exceptions. See

Britt, 886 F.2d at 547-50 (mere "relevance" to recipient entity held to be improper standard for a "compatible" routine use disclosure). Therefore, its disclosure can not be justified by the routine use exceptions relied upon by CIA/DOJ.

> i.   The Actions Of The DOJ Are Legally Imputed To The CIA

An agency relationship is the fiduciary relationship which results from the "manifestation of consent by one person to another that the other shall act on his behalf." RESTATEMENT (SECOND) OF AGENCY, § 1 (1958)("Restatement"). "Among the most firmly established principles in our law is that a principal may be held responsible for the acts of an agent committed within the scope of employment." International Longshoremen's Association, AFL-CIO et al.,  v.  National Labor Relations Board, 735 F.2d 1384, 1394 (D.C.Cir 1984). See, e.g., American Fur Co. v. United States, 27 U.S. (2 Peters) 358, 364, 7 L.Ed. 450 (1829); United States v. Gooding, 25 U.S. (12 Wheat.) 460, 469-70, 6 L.Ed. 693 (1827)(Story, J.). See also RESTATEMENT, § 144 (stating general rule of agency that principle is responsible for acts undertaken by authorized agent). A principal may be responsible for the act of his agent within the scope of the agent's general authority if the principal actually empowered the agent to represent him in the general area within which the agent acted. International Longshoremen's Association, 735 F.2d at 1394 (citations omitted). See RESTATEMENT, § 140 (Principle is responsible for the authorized representations of his agent).

The Supreme Court has held that where a litigant has chosen an attorney as its representative in the action, it cannot avoid the consequences of the acts or omissions of this selected agent. "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-

agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" <u>Link v. Wabash Railroad Co.</u>, 370 U.S. 626, 633-634, (1962). <u>See also</u> <u>Frontier Hotel & Casino v. National Labor Relations Board</u>, 118 F.3d 795, 800 (D.C. Cir. 1997)(company "cannot escape responsibility for the misconduct of its former attorney").

Thus, not only did the DOJ act in its own right when it filed Sullivan's SSN, and thereby must comply with the parameters of its respective routine use, DOJ's actions are also directly imputed to that of the CIA. In this instance, the DOJ was, in fact, the CIA when it filed Sullivan's SSN.

## C. The Disclosure of Sullivan's Social Security Number Was Patently Egregious And Unlawful

The government highlights <u>Eddington et. al. v. CIA et al.</u>, C.A. No. 97-0872 (D.D.C. Feb. 16, 1999), <u>aff'd</u> 221 F.3d 195 (D.C. Cir. 2000)(unpublished disposition), which was litigated by Sullivan's counsel and did address similar arguments. However, regardless of how that case ultimately turned out, significant changes have occurred in the law since that time, particularly the <u>Doe</u> litigation concerning SSNs and this Court's adoption of a new and explicit SSN privacy policy.[17] In fact, of the few cases, most of which are unpublished, that the government cited in support of its argument that no violation occurred, <u>see</u> Defs' Memo at 35-36 (citing cases), only two postdated the <u>Doe</u> litigation and the adoption of judicial protections (discussed below) against the public filing of

---

[17] The defendants have filed the two <u>Eddington</u> decisions as well as the undersigned counsel's response to the D.C. Circuit's Order to Show Cause. To this day counsel has no idea why the D.C. Circuit issued that Order, particularly after it had denied the CIA's Motion for Summary Affirmance. If this Court desires any further elaboration as to what took place in the <u>Eddington</u> litigation the undersigned would be happy to do so but it would seem the documents speak for themselves and, in light of subsequent legal developments, dictate absolutely nothing of precedential value to these proceedings (particularly since there is no published D.C. Circuit decision).

SSNs. There is no evidence in either of those cases that the protected information that fell within those agencies' routine uses were SSNs.

Section 552a(g)(4) of the Privacy Act "imposes liability only when the agency acts in violation of the Act in a willful or intentional manner, either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act." Albright, 732 F.2d at 189 (footnote omitted). It is important to understand that the words "intentional" and "willful" in subsection (g)(4) do not have their vernacular meanings; instead, they are "terms of art." White v. OPM, 840 F.2d 85, 87 (D.C. Cir. 1988)(per curiam). The Act's legislative history indicates that this unique standard is "[o]n a continuum between negligence and the very high standard of willful, arbitrary, or capricious conduct," and that it "is viewed as only somewhat greater than gross negligence." 120 Cong. Rec. 40,406 (1974).

The "Privacy Act, if it is to be given any force and effect, must be interpreted in a way that does not 'go against the spirit' of the Act." Wilborn v. Department of Health & Human Services, 49 F.3d 597, 600 (9th Cir. 1995)(citation omitted). "Even the most cursory reading of the Privacy Act suggests that Congress was motivated in passing the Act by the devastating effects that disclosure of one's social security number can bring." Herman, 1999 U.S. Dist. LEXIS 17302, *44, citing Pub. L. No. 93-579, §7(a)(1), 88 Stat. 1895, 1909. Moreover, a motive of retaliation, as is asserted here, is sufficient to defeat a motion to dismiss and to demonstrate that an agency official may have acted willfully or intentionally. Henson et al. v. NASA et al., 14 F.3d 1143, 1149 (6th Cir. 1994).

      1.   *The Rules Of This Court Openly And Clearly Prohibit The Filing Of An Individual's Social Security Number*

The filing of Sullivan's SSN by the CIA/DOJ violated this Court's explicit rules. <u>See</u> "NOTICE REGARDING PRIVACY AND PUBLIC ACCESS TO ELECTRONIC CIVIL CASE FILES" at *http://www.dcd.uscourts.gov/civil-privacy.pdf*. This policy, which clearly obligated the CIA/DOJ to at a minimum redact portions of Sullivan's SSN (and given the SSN was not relevant to any issue likely redact the numbers in their entirety) , was adopted in September 2004, in compliance with the Judicial Conference of the United States, and the E-Government Act of 2002, as amended.

Compliance with this policy "rests solely with counsel and the parties", <u>id</u>., and contributes to a finding that the violation was intentional and willful.

      2.   *The CIA Routinely Redacts Social Security Numbers Even From Documents Sent To The Individual To Whom The Number Belongs*

Whether the filing of Sullivan's SSN by the DOJ can be simply chalked up to some lesser degree of negligence, as DOJ's counsel seems to imply (as discussed below), is yet to be determined, but all evidence tends to indicate the CIA's actions were nothing less than deliberate. It can not be disputed that the CIA is probably one of the, if not the, most knowledgeable and prolific redactors among the federal government. To believe that the CIA is not aware of the need to redact someone's SSN from public filings is simply laughable. Zaid Decl. at ¶¶12-13.

To demonstrate how serious the CIA normally views the sanctity of SSNs one needs only look at an example of a Privacy Act released document for an individual who was not commenting critically about the CIA. In most, if not all cases, the CIA would actually redact the SSN of the very individual whose record it is, i.e., despite the document being

released from a system of records belonging to the very subject, the CIA would nevertheless redact that person's SSN as a matter of general practice and policy. Id. at Exhibit "J".

In light of this practice and policy, the CIA's actions to publicly disclose Sullivan's SSN flagrantly disregarded his rights under the Act, Albright, 732 F.2d at 189, and were therefore intentional and willful. See White, 840 F.2d at 87 (agency's failure to comply with established policy might constitute willful and intentional conduct).

### 3. Discovery Is Appropriate To Address Whether The Disclosure Was Intentional And Willful

If the evidence as it currently exists is deemed insufficient to outright justify a finding of liability on the part of the CIA/DOJ, it certainly should be construed as sufficient to require denial of the CIA/DOJ's motion at this time. "Because most of the evidence relating to this issue is likely to be exclusively in the possession of the government, it would seem appropriate to accord [plaintiff] the discovery necessary to this issue." Britt, 886 F.2d at 551; Pontecorvo v. FBI, No. 00-1511, slip op. at 13-15 (D.D.C. Sept. 30, 2001)(denying agency summary judgment and ordering discovery to determine whether the agency "overstepped [the] explicit restrictions" contained in its routine use).

In what must be viewed as a self-serving declaration (replete with inappropriate substantive legal arguments), DOJ's attorney seeks to escape culpability by factually asserting:

> I did not notice that one of the documents contained plaintiff's social security number at the time of filing, nor to the best of my knowledge and belief did anyone else at the CIA or DOJ. Had I noticed, I would have redacted it from the document.

Defs' Memo, Declaration of Peter M. Bryce at ¶6 (dated January 31, 2008).[18] Beyond the

fact that by his own admission Mr. Bryce does not know what was in the minds of those

at the CIA (even if he had identified specific CIA employees they should be required to

speak for themselves), his personal comments raise a question of fact to be explored

through discovery. Indeed, whether or not he "noticed" the SSN is not the test that will

guide this Court to determine willful or intentional. See e.g. Wilborn, 49 F.3d at 602-03

(official's knowledge of the Privacy Act a factor in determining willful and/or intentional

conduct).

Prior to granting the government's Motion, Sullivan should be permitted to submit

interrogatories and document production requests as well as depose, among others, Mr.

Bryce, his supervisors, and the relevant CIA personnel who participated in handling

Sullivan's documents. Indeed, with respect to Sullivan's claims under subsection (e)(9)

and (e)(10), neither of which has been the subject of much judicial discussion, it would

make far more sense to allow discovery to take place to explore the nature of the

agencies' compliance with the Privacy Act and the structure of its systems and

regulations prior to dismissal at the outset of the case.

**D.  Sullivan Is Able To Demonstrate Both An Adverse Effect And Damages**

"In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section

in which the court determines that the agency acted in a manner which was intentional or

willful, the United States shall be liable to the individual in an amount equal to the sum of

---

[18] Frankly, DOJ should reassign another attorney to this matter. With absolutely no disrespect to Mr. Bryce, there is no question he is a "necessary" material fact witness in this case. As an ethical matter, he truly can not serve as both the advocate for the defendants and a witness at the same time. This is exactly the scenario envisioned by Rule 3.7 (Lawyer as Witness) of the Rules of Professional Conduct.

... actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000." 5 U.S.C. § 552a(g)(4). The first Supreme Court decision in the history of the Act was issued four years ago in <u>Doe v. Chao</u> and settled the question that proof of actual damages is required in order to recover either the statutory minimum or damages beyond the minimum (and also confirmed that actual damages include out-of-pocket expenses). 540 U.S. at 627.

Sullivan can demonstrate that he has suffered adverse effects and actual damages as he incurred out-of-pocket expenses as a result of the CIA/DOJ's unauthorized disclosure of his SSN by having to purchase a credit report to check to confirm there no evidence yet exists that someone had stolen his identity. Sullivan Decl. at ¶15 & Ex. "A".[19] According to the Supreme Court, this alone is sufficient. <u>Chao</u>, 540 U.S. at 626 fn. 10 (specifically referencing "fees associated with running a credit report").

---

[19] The defendants assert that Sullivan's claims should be dismissed because he has failed to allege any adverse effects or actual damages. Defs' Memo at 41-42. In light of the evidence provided by Sullivan herein, if necessary Sullivan can simply seek leave to file a Second Amended Complaint to remedy any perceived technical deficiency. Again, it would likely make far more sense to allow discovery to proceed and then address the issue in an Amended Complaint at that time, not at this initial early stage.

## **CONCLUSION**

For the reasons set forth above, the defendants' Motion should be denied without

prejudice and discovery should be permitted.

Date: March 27, 2008

Respectfully submitted,

/s/
_____
Mark S. Zaid, Esq.
DC Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

# EXHIBIT "1"

# Declaration of
# John F. Sullivan

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN F. SULLIVAN | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 07-00685 (RWR) |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| <u>et al</u>., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>DECLARATION OF JOHN F. SULLIVAN</u>**

The undersigned hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I am the plaintiff in this action and make this Declaration on personal knowledge. This Declaration is submitted in support of my Opposition to Defendants' Motion to Dismiss First Amended Complaint.[1]

2.  I was formerly employed as a polygrapher by the Central Intelligence Agency (CIA) from 1968 – 1999. By the time I retired (and I believe to this day) I had conducted more polygraph examinations for the CIA than any other polygrapher in the history of the Agency. I held a TS-SCI security clearance for the entire time I was employed with the CIA.

---

[1] All statements of fact, opinion, or analysis expressed are those of the author and do not reflect the official positions or views of the Central Intelligence Agency (CIA) or any other U.S. Government agency.  Nothing in the contents should be construed as asserting or implying U.S. Government authentication of information or CIA endorsement of the author's views.  This material has been reviewed by the CIA to prevent the disclosure of classified information.

3.   I understand and accept that I have a lawful obligation to submit any writings for pre-publication review that relate to topics encompassed by my former employment. By the signing of my secrecy agreement I agreed not to reveal any classified information and I have observed that agreement. However:

- I did not agree to never criticize the CIA;

- I did not agree to being subjected to unethical and/or unlawful conduct as witnessed by specific polygraph examinations and prepublication review proceedings;

- I did not agree to withhold reporting on deficiencies in the polygraph examination process, something regarding which I have considerable and unique expertise; and

- I did not agree to have my post-CIA career subjected to the whims of CIA officials in a manner that is not in compliance with statutory or constitutional rights and the CIA's own internal rules and regulations.

4.   My two manuscripts *Of Spies and Lies: A CIA Lie Detector Remembers Vietnam* (2002) and *Gatekeeper: Memoirs of a CIA Polygraph Examiner* (2007) were critical of the CIA in general and its polygraph program in particular. While the former was approved in less than a month with eleven words – out of 112,000 – being redacted, the latter took nearly three years to gain approval. Yet ultimately all the CIA redacted was fifteen words out of a total of 115,000.

5.   On 11 March  2004, I submitted to a polygraph examination. Having conducted thousands of similar type examinations over the years, I was well aware of the rules and

procedures that all polygraphers are required to adhere to throughout the examination and afterward. With that knowledge in mind, I was surprised that my examiner failed to follow numerous standard procedures. More importantly, it soon became quite apparent during the interrogation that my book *Gatekeeper* had significantly struck some nerves within the Polygraph Division. The examiner intently focused his questions on the contents of the book and accused me of withholding information from him as it related to *Gatekeeper*.

6.  On 25 March 2004, I met with a CIA Security Professional to address what he described as "unresolved reactions to issues" during the polygraph examination. The individual said to me "there is something about your book that you're not telling us, and until you do I can't help you".

7.  On 14 February 2005, I received a letter from the CIA, dated 28 January 2005, stating that I had been disapproved for access to classified information. I was shocked and dismayed, to say the least. This was nothing less than a slap in the face of all the years of service I had devoted to the CIA. It seemed quite clear, particularly after reviewing my investigative file, that the denial originated from information provided by the Polygraph Division, and that this was motivated by the Division's disdain for the critical contents of my forthcoming book.

8.  I appealed the CIA's denial and in June 2005, I received a letter from the CIA stating that the decision to deny me access to classified information had been "overturned". To be quite honest this sudden reversal, while of course welcome, was also rather shocking especially given the allegations that had been lodged against me and my knowledge of how rarely the CIA reverses its clearance decisions. Given that I had not yet

even had a "personal appearance" with security officials, which is standard operating procedure when dealing with administrative appeals of denials of a security clearance, I was further persuaded that the initial denial was nothing less than a clear example of retaliation against me for exercising my First Amendment rights.

9.   I also received an email dated 28 September 2005 from "Robert Roe", Chief/Quality Assurance, that stated: "I can assure you that the security professional was not correct regarding the results of your test….I am at a lost (sic) to explain the time involved in your situation". This only further strengthened my opinion as to the inappropriateness that transpired.

10. In or around Fall 2005, I met with officials of the defense contractor Raytheon concerning my possible employment with this company. In fact, Raytheon had sought me out for a position. I provided them with a privacy waiver so that they could inquire with the CIA about the status of my clearance eligibility. I never heard back from them. At around this same period I had also pursued employment with the Overseas Cadre, an office within the CIA. I was told by Karen S., a personnel officer with the Overseas Cadre, that they had been told I had cancelled my security clearance processing. This was flatly inaccurate as I never done any such thing. Based on this experience I believe that Raytheon was similarly falsely told that I did not have a current eligibility for access to classified information. In the contracting world this is a death-knell as the contractors do not wish to expend significant time trying to get new personnel cleared.

11. It was a disconcerting nightmare to have undergone the security proceedings and false allegations from polygraphers in my old Division, not to mention the abuse of the review procedure of my second book. I have no doubts that were I to submit additional

4

writings that are critical of CIA personnel or offices that I would be subjected to similar treatment, and quite frankly I do not wish to find out if that is true or not.

12. As a result of the treatment I was subjected to as set forth in my First Amended Complaint, I do not plan to allow myself to be in the hot seat again. For months the status of my security clearance was at the mercy of CIA officials who had a legitimate motive, and tried their best, to undermine my professional career and my efforts to publish *Gatekeeper*. In fact, in the Summer 2007 I submitted a proposed text book chapter to the CIA for review. The CIA responded with redactions that were so extensive and unnecessary that I decided not to go ahead with the project. Even when a CIA representative called me and suggested I pursue publication of the chapter my prior experiences were so unhealthy that it chilled my interest in pursuing any challenge and I declined to do so. Had it not been for the retaliatory conduct I experienced I would likely have pushed forward.

13. As if the treatment I received during 2005 was not enough I was again violated during the CIA's prosecution of my lawsuit. I discovered that the CIA, through its attorneys at the Department of Justice, had publicly filed my personal information in open court without my consent. The most significant of the information was my social security number. While at first neither my lawyers nor I particularly noticed that this violation had occurred ultimately we did and requested that the unredacted documents be sealed. I had no objection to the substantive contents of the correspondence between the CIA and myself filed as part of this lawsuit but my social security number (and other personal information) had absolutely nothing to do with the substance of my security clearance challenge or prepublication review processing.

14. The CIA knows full well that it must redact personal information and especially social security numbers. This is an Agency that has not met a sentence it did not relish redacting. Secrecy is engrained upon us within the CIA and there is absolutely no excuse for such a blatant and egregious violation.

15. Admittedly I can not say at this time whether or not someone took advantage of the CIA/DOJ's violation of my privacy and copied down my social security number in order to steal my identity or commit some other type of fraud. Nevertheless, I was certainly emotionally bothered by the transgression when I first came to learn of it. As a result, on 14 February 2008, I was forced to incur out-of-pocket expenses of $29.95 to purchase a copy of my credit report to ensure no unauthorized activity had taken place. Exhibit "A". I will continue to purchase additional credit reports over the next few months to monitor my credit status and verify that the misconduct of the CIA and Justice Department did not cause me any additional harm.

I do solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge.

Date:   March 26, 2008

/s/

_____

John F. Sullivan

03/20/2008   08:17       7034810304

**Sony**Card

J. F. Sullivan

Opening/Closing Date:      02/12/08 - 03/11/08
Payment Due Date:              03/31/08
Minimum Payment Due:            $33.00

**VISA ACCOUNT SUMMARY**          Account Number:

| | | | |
|---|---|---|---|
| Previous Balance | $1,872.48 | Total Credit Line | $12,500 |
| Payment, Credits | -$1,872.48 | Available Credit | $10,813 |
| Purchases, Cash, Debits | +$1,686.43 | Cash Access Line | $6,250 |
| New Balance | $1,686.43 | Available for Cash | $6,250 |

pd   1⁹ MAR '08
#  2269
$ 1,686. 43

**CUSTOMER SERVICE**
In U.S.          1-877-717-7869
Español          1-888-446-3308
TDD              1-800-955-8060
Pay by phone 1-800-436-7958
Outside U.S. call collect
                 1-302-594-8200

**ACCOUNT INQUIRIES**
P.O. Box 15298
Wilmington, DE 19850-5298

**PAYMENT ADDRESS**
P.O. Box 15153
Wilmington, DE 19886-5153

**VISIT US AT:**
www.chase.com/sonycard

**SONY CARD REWARD POINTS SUMMARY**
Promotional Points                                   0
Points Earned From Everyday Purchases             1,687
Total Points Posted to your Sony Card Account     1,687

Check or redeem your Sony Points at
www.sony.com/sonycard.

The points above reflect only purchases made during your statement period. To
see a complete summary of your Sony Rewards points visit
www.sony.com/sonycard or call toll free 1-877-718-SONY (7669).

**TRANSACTIONS**

| Trans Date | Reference Number | Merchant Name or Transaction Description | Amount Credit | Debit |
|---|---|---|---|---|
| 02/10 | 2442733804271000797... | | | $6.02 |
| 02/09 | 2470750504298001887... | | | 21.00 |
| 02/11 | 2465300304390001519... | | | 18.11 |
| 02/12 | 2442733804371000844... | | | 9.20 |
| 02/11 | 24425634543181323263... | | | 80.90 |
| 02/14 | 2469216804500056859... | APG PRIVACYMATTERS12-V 877-993-6264 CT | | 29.95 |
| 02/14 | 2469216804500056859... | APG PRIVACYMATTERS12-V 877-993-6264 CT | | 1.00 |
| 02/14 | 2444500504618503229... | | | 11.92 |
| 02/14 | 2416407804610508219... | | | 90.29 |
| 02/14 | 2442733804671000123... | | | 89.94 |
| 02/17 | 2421073804820733225... | | | 475.00 |
| 02/16 | 2470780804998001887... | | | 10.00 |
| 02/19 | 2416407805009100543... | | | 8.46 |
| 02/18 | 2442863805019060738... | | | 23.90 |
| 02/18 | 2444500805019273303... | | | 12.98 |
| 02/18 | 2465300805090001669... | | | 13.13 |
| 02/19 | 2442733805171000677... | | | 37.85 |
| 02/20 | 2440140805200135763... | | | 3.90 |
| 02/20 | 2461317805256305212... | | | 5.25 |
| 02/22 | 1053063020000113240... | | 1,872.48 | |
| 02/22 | 2422443805444833530... | | | 7.09 |
| 02/22 | 2416407805479905317... | | | 25.00 |
| 02/23 | 2442733805671000700... | | | 9.11 |
| 02/24 | 2442733805571000701... | | | 25.91 |
| 02/24 | 2444574805618761828... | | | 31.49 |
| 02/25 | 2442733805560800009... | | | 90.00 |
| 02/23 | 2470780805660010972... | | | 7.00 |
| 02/24 | 2442733805671000834... | | | 8.02 |
| 02/25 | 2461043805707200056... | IK  STONY HOLLAR | | 10.87 |
| 02/27 | 2444500805920102905... | | | 15.93 |
| 02/26 | 2442733805871000104... | | | 56.71 |
| 02/28 | 2442733900697100087... | | | 11.40 |
| 02/28 | 2442863806920173877... | | | 31.75 |
| 03/01 | 2471705806125061048... | | | 35.00 |
| 02/28 | 2462573806028130639... | | | 92.00 |
| 03/01 | 2444573806220480492... | | | 31.49 |
| 03/01 | 2444574806220540060... | | | 1.75 |
| 03/01 | 2444574806220540060... | | | 15.74 |

# EXHIBIT "2"

# Declaration of Mark S. Zaid, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN F. SULLIVAN                          *
                                          *
              Plaintiff,                  *
                                          *
       v.                                 *    Case No. 07-00685 (RWR)
                                          *
CENTRAL INTELLIGENCE AGENCY               *
et al.,                                   *
                                          *
       Defendants.                        *
                                          *
*    *    *    *    *    *    *    *    *    *    *    *

**DECLARATION OF MARK S. ZAID, ESQ.**

I, MARK S. ZAID, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in support of the plaintiff's Opposition to Defendant's Motion to Dismiss Amended Complaint.

2.  I am the attorney of record for plaintiff John F. Sullivan ("Sullivan"). I am admitted to practice law in the States of New York, Connecticut and the District of Columbia (and pending formal admission in Maryland), as well as the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York and the Southern District of New York. I have been litigating cases pertaining to national security and the Privacy Act since 1993.

3.  I have represented approximately hundreds of employees and contractors within the Intelligence and Military Communities in employment matters, especially in security clearance proceedings (suspensions, denials, revocations). Over the last decade I have handled more than a dozen prepublication review cases, particularly with the CIA, both at the administrative and litigation stages. See e.g. Berntsen v. CIA, 511 F. Supp. 2d 108 (D.D.C. 2007); Stillman v. CIA 209 F. Supp. 2d 185 (D.D.C. 2002), rev'd on other

grounds, 319 F.3d 546 (D.C. Cir. 2003); Boening v. CIA, Civil Action No. 07-430
(D.D.C.)(EGS); Waters v. CIA, Civil Action No: 06-383 (D.D.C.)(RBW); Sterling v.
CIA, Civil Action No: 03-0603 (D.D.C.)(TPJ); Wendy Lee v. CIA, Civil Action No. 03-
0206 (D.D.C.)(TPJ). I have also litigated numerous classification challenges under the
Freedom of Information Act ("FOIA"), and I have been co-teaching the D.C. Bar's CLE
course on FOIA (with some minimal coverage of the Privacy Act) for several years. For
the last three years I have also co-taught the D.C. Bar's CLE course on defending security
clearances.

*Pattern and Practice Of CIA Retaliation*

4.   It has been my experiences, many of which I can detail further if the Court desires
(both classified and unclassified), that officials and offices within the CIA will not
hesitate to retaliate against its current or former employees who seemingly stray across
whatever line the CIA has established for itself. It is not at all uncommon for the CIA's
Office of Security to abuse its authority and misuse security proceedings for the purposes
of retaliation, as would appear to be the case for Sullivan. This is nothing less than a
pattern and practice of questionable, if not outright, misconduct.

5.   The same is true with respect to prepublication review proceedings undertaken by
the CIA. When the Publications Review Board ("PRB"), the office to which
current/former employees submit written materials to for classification review, receives a
submitted document it is farmed out to the relevant offices which, and individuals whom,
may possess equities in the information. Thus, in Sullivan's case his manuscripts were
provided to the Polygraph Division where he used to work. Of course, this Division was
the subject of significant criticism levied upon it by Sullivan in his manuscripts.
Therefore, it should come as no surprise that motivation existed for those reviewing the
manuscripts to retaliate against Sullivan, whether this came in the form of excess
redactions or significant delays with the review process. In Sullivan's case it was the

2

latter, which is also nothing less than a pattern and practice of questionable, if not outright, misconduct I often see with the CIA.

*Significance Of A Denial Of Access To Classified Information*

6.   With respect to security clearance proceedings, although all federal agencies must follow the procedural due process guidelines set forth by Executive Order 12,968, the appeal process that has been implemented varies significantly throughout the federal government. For example, under many circumstances, when an agency has concerns about an individual applying for a security clearance it is often that a Notice of Intent to Deny Access to Classified Information is issued, rather than an actual Notice of Denial. When the former occurs the individual has the ability to challenge the forthcoming decision and avoid having to ever indicate they were denied a clearance. However, in the latter case, which is how the CIA operates, the individual is actually denied a security clearance and can only hope they can persuade the CIA to reverse the decision at a later date. The CIA, in fact, likely has the worst record of all the agencies in reversing adverse clearance determinations. It is so rare that in the two instances where a reversal of a denial occurred that I personally know of during the last ten years, one of which is that of Sullivan, I am convinced beyond any doubt that the initial decision was nothing less than retaliatory and punitive.

7.   Though Sullivan did ultimately reverse the denial of the CIA of his access to classified information, it would be inaccurate to say that this act restored him to status quo. It is a stigma to have been denied access to classified information, and it never goes away. And while the decision was pending it was "final" in every way, shape or form. It had significant preclusive effects. Although it is true that Sullivan will now not have to acknowledge on any subsequent SF-86s that he completes that he was denied, there are numerous ways in which agencies can discover that, in fact, he had been denied a security clearance. When that occurs, and it would always occur were Sullivan to seek a contract position with the CIA, the CIA will release or provide access to Sullivan's security file.

3

That file, of course, continues to contain the derogatory and inaccurate information that Sullivan contests. Indeed, reversal of the initial determination does not equate to an acknowledgment by the CIA that the factual information relied upon was inaccurate and it can easily be used against him in the future.

<em>The Defendants' Filing Of Sullivan's Social Security Number</em>

8.   Due to other legal and family obligations I was facing in the immediate aftermath of the defendants' filing of their initial Motion to Dismiss, I honestly did not pay close attention, much less any attention, to the documents that had been filed. I properly and timely sought an extension of time and when I did appropriately turn my attention to the filings I noticed that the defendants had filed personal, privacy protected information pertaining to Sullivan in open court. When I did, I reacted promptly and the documents were sealed (and redacted copies were filed in their place). The quick response by the defendants' lawyer, Peter Bryce, to facilitate this transaction was appreciated. That the documents were on the public record for the time that they were is unfortunate, but that we did not particularly notice what had occurred does not minimize the legal significance of the transgression.

9.   After filing Sullivan's First Amended Complaint which added six new Privacy Act claims pertaining to the unauthorized disclosure of Sullivan's social security number, I was threatened with Rule 11 sanctions by the defendants' counsel. Understandably, I do not take such an accusation lightly. As a gesture of good faith, and to demonstrate the viability of these claims, I provided the defendants with an advance view of the legal theories we were operating under and I invited a substantive response, which I never received.

10. The government highlights <u>Eddington et. al. v. CIA et al.</u>, C.A. No. 97-0872 (D.D.C. Feb. 16, 1999), <u>aff'd</u> 221 F.3d 195 (D.C. Cir. 2000)(unpublished disposition), which I litigated almost a decade ago. The case did address similar arguments. However, significant changes have occurred in the law since that time, particularly specific

4

litigation (starting with Doe v. Herman, 1999 U.S. Dist. LEXIS 17302 (W.D.Va. Oct 29, 1999) and going all the way to the Supreme Court in 2004, and finally ending in 2006) concerning SSNs that was mostly litigated after my case, the enactment of the E-Government Act of 2002 and the 2004 Judicial Conference which led to this Court's adoption of a new and explicit SSN privacy policy in 2004. The defendants have filed the two Eddington decisions as well as my response to the D.C. Circuit's Order to Show Cause. To this day I have no idea why the D.C. Circuit issued that Order, particularly after it had denied the CIA's Motion for Summary Affirmance (which, by the way, never raised any Rule 11 allegations). If this Court desires any further elaboration as to what took place in the Eddington litigation I would be happy to do so but it would seem the documents speak for themselves and, in light of subsequent legal developments, dictate absolutely nothing of precedential value to these proceedings (particularly since there is no published D.C. Circuit decision).

    11. The defendants selectively reference just a few of the documents that were exchanged between the attorneys for the parties. Because this does not present a complete portrayal of what transpired, I have attached to this declaration the following exhibits which accurately represent the relevant substantive communications that I had with Peter Bryce, Esq., Trial Counsel, Federal Programs Branch, U.S. Department of Justice, who is defending this matter for the defendants. The documents speak for themselves.

| | | |
|---|---|---|
| Exhibit "A" | - | Zaid Letter to Bryce dated November 4, 2007 |
| Exhibit "B" | - | Bryce Letter to Zaid dated November 15, 2007 |
| Exhibit "C" | - | Zaid Letter to Bryce dated November 20, 2007 |
| Exhibit "D" | - | Zaid Letter to Bryce dated November 21, 2007 |
| Exhibit "E" | - | Zaid Letter to Bryce dated December 26, 2007 |
| Exhibit "F" | - | Zaid E-mail to Bryce dated January 2, 2008 |
| Exhibit "G" | - | Bryce Letter to Zaid dated January 3, 2008 |

Exhibit "H"    -    Zaid Letter to Bryce dated January 17, 2008

Exhibit "I"    -    Zaid Letter to Bryce dated January 21, 2008

12. In my extensive dealings with the CIA, it is literally laughable to suggest the CIA did not recognize what it was doing when it publicly filed a record from Sullivan's Privacy Act System of Records that contained his social security number. As but just one example of how the CIA typically operates, I once handled a FOIA case against the CIA that took litigation to pry from their hands, and this was in 1995, a sentence in a manuscript that revealed Allen Dulles (1893-1969) had served as the Agency's third Director (1953-1961). In unclassified litigation I am often asked not to publish full names of even overt CIA employees. I can not emphasize enough, based on years of experience, how out of character the public filing of a social security number is for the CIA. The policy and practice of the CIA is to redact any type of identifying data, and most importantly a social security number.

13. To demonstrate just how out of character it was I have attached, as Exhibit "J", several pages from another client's CIA investigative file (with his permission of course) that was released in 2007 as part of his challenge to the CIA's denial of his access to classified information. This document, which is part of his SF-86 application, was originally submitted by my client to the CIA during his security processing and was subsequently released to him as part of his appeal. He personally requested the copy of his investigative file and it was sent only to him, yet the CIA still thought it necessary and appropriate to redact his social security number from all the pages (Note: the black portions are the CIA redactions – they even redacted his own home number).

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   March 27, 2008

/s/

_____

Mark S. Zaid

# EXHIBIT "2-A"

## Zaid Letter to Bryce dated November 4, 2007

# MARK S. ZAID, P.C.
### ATTORNEY-AT-LAW

1250 CONNECTICUT AVENUE, N.W.
SUITE 200
WASHINGTON, DC 20036
————
TELEPHONE: (202) 454-2809
FACSIMILE: (202) 330-5610

MARK S. ZAID, MANAGING PARTNER
E-MAIL: MARK@MARKZAID.COM
BRADLEY P. MOSS, ASSOCIATE
E-MAIL: BRAD@MARKZAID.COM

November 4, 2007

<u>VIA E-MAIL</u>

Peter Bryce
Trial Attorney
United States Department of Justice
Civil Division, Rm. 7308
20 Massachusetts Ave, NW
Washington, D.C. 20530

Re: <u>Sullivan v. CIA et al.</u>, Civil Action No. 07-0685 (RWR)

Dear Peter:

The three documents you filed as exhibits to the Tormey Declaration contain Privacy Act protected information; namely, Mr. Sullivan's home address, telephone number, e-mail address and social security number.

I am writing today to request immediate action by the Department of Justice to either withdraw these three exhibits from public view and substitute redacted copies, or move to have the three documents filed under seal. I am most concerned, for what should be obvious reasons, with having Mr. Sullivan's social security number available for anyone who wishes to commit identity fraud.

I am neither requesting that you agree with my assertion that this information is privacy protected, nor that the Privacy Act was violated by the CIA/DOJ having filed the documents in the first place, but merely to understand the legitimate concerns my client has with respect to having the information so easily available and the vulnerability that may exist. With that in mind, I am respectfully seeking your cooperation to minimize these concerns.

I would appreciate hearing back from you as promptly as possible as to the Department's willingness to assist in this matter. Otherwise I will need to take immediate steps of my own to seal the exhibits. Thank you for you consideration, and I look forward to hearing from you soon. Best to reach me via e-mail or cell at 202-498-0011.

Sincerely,

/s/

Mark S. Zaid

cc: John Sullivan

# EXHIBIT "2-B"

Bryce Letter to Zaid dated
November 15, 2007



U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW, Room 7308
Washington, D.C. 20001

---

Peter Bryce
Trial Attorney

Tel: (202) 616-8335
Fax: (202) 616-8470
peter.bryce@usdoj.gov

November 15, 2007

**VIA E-MAIL AND OVERNIGHT DELIVERY**

Mark S. Zaid
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

      **Re:**    **Sullivan v. Central Intelligence Agency, et al., 1:07-cv-00685**

Dear Mark,

      I write regarding your amended complaint in the above-captioned litigation, and specifically, to request that you withdraw the new Privacy Act claims you've asserted based on the exhibits attached to defendants' motion to dismiss the original complaint (Counts Seven through Twelve of the First Amended Complaint). In our view, these claims add nothing of substance to the litigation and do not meet the standards set forth in Fed. R. Civ. P. 11.

      Regarding the merits of these claims, we respectfully direct your attention to the Department of Justice, Civil Division's routine use provisions, and in particular, to Routine Use No. 7, which permits disclosure of arguably relevant records in a judicial proceeding where an agency is a party. See 66 Fed. Reg. 36593-94 (July 12, 2001). The CIA has a similar routine use provision which also permits the disclosure of the exhibits in this judicial proceeding. See 70 Fed. Reg. 42418 (Routine use No. 4). These routine use provisions are squarely applicable here.

      Even if you disagree, there is clearly no basis to allege that the disclosure of these exhibits constituted a "willful and intentional" violation of the Privacy Act. The above-cited routine use provisions clearly provided a good faith basis for filing the exhibits. Moreover, and as you are well aware, the agency and the DOJ acted very quickly and effectively to protect the portions of the documents about which you expressed concern, and did so before learning of your intent to bring new Privacy Act claims.

      For these and various other reasons, we think that there is no factual or legal basis for the new claims pertaining to the filing of these exhibits. In any event, the information you identified as a concern was addressed immediately after you alerted us to it, and the exhibits are now redacted. Accordingly, we ask that you withdraw those claims, as well as allegations related to such claims. If you agree to do so, we would of course be willing to renegotiate the

answer/response schedule to reflect that DOJ is no longer a party. Alternatively, if you refuse to withdraw the claims, we ask that you identify your good faith basis under Fed. R. Civ. P. 11 for asserting them, particularly in light of the routine use provisions and the "willful and intentional" requirement discussed above.

Sincerely,

Peter Bryce

# EXHIBIT "2-C"

## Zaid Letter to Bryce dated November 20, 2007

# MARK S. ZAID, P.C.
## Attorney-At-Law

1250 CONNECTICUT AVENUE, N.W.
SUITE 200
WASHINGTON, DC 20036
———

TELEPHONE: (202) 454-2809
FACSIMILE: (202) 330-5610

MARK S. ZAID, MANAGING PARTNER
E-MAIL: MARK@MARKZAID.COM
BRADLEY P. MOSS, ASSOCIATE
E-MAIL: BRAD@MARKZAID.COM

November 20, 2007

VIA E-MAIL AND FACSIMILE

Peter Bryce
Trial Attorney
United States Department of Justice
Civil Division, Rm. 7308
20 Massachusetts Ave, NW
Washington, D.C. 20530

Re: Sullivan v. CIA et al., Civil Action No. 07-0685 (RWR)

Dear Peter:

I am in receipt of your letter of November 15, 2007. I have carefully reviewed your comments and your allegations are not taken lightly.

I do understand the sensitivity of this matter and your concern given that your conduct has been unfortunately called into question. I very much regret that this had to be. As you can see from the Amended Complaint, I took a different tact with respect to your involvement, as well as that of DOJ, than with respect to CIA. However, I could not legally or ethically ignore the involvement of DOJ, and therefore those within DOJ who acted on its behalf, given that I challenged the CIA's underlying conduct. After all, DOJ is acting as legal counsel for CIA and must share a level of responsibility, whether as an agent or a principal.

And while I do understand that these new claims may have touched a raw nerve, I find your accusation that I have committed a Rule 11 violation to be completely baseless and insulting. I have done nothing of the kind, and I assure you that neither the Department of Justice nor the CIA can intimidate me to withdraw claims asserted on behalf of a client by threatening me with sanctions. Though I am under no obligation to provide you with my legal analysis, as a gesture of good faith and professionalism, I will identify some of the case law that influenced my decision to add these claims. If you wish to dissect the information below and provide to me your legal analysis as to why you believe I have not overcome your allegation of frivolity, I will be glad to entertain it further discussions. But rest assured if you do not persuade me, I will not hesitate to reciprocate in kind should you pursue your stated intent.

In preparing the Amended Complaint I reviewed the Department of Justice's Privacy Act Overview (2004 edition), and the applicable DOJ and CIA routine use provisions. I am well aware of the citation you provided of 66 Fed. Reg. 36593-94 (July 12, 2001), but this did not modify the applicable DOJ routine use. It merely restated the routine use for the Department's Civil Division files among notification that two new – irrelevant – routine uses were being added. I am also aware of 63 Fed. Reg. 8666, 8667-68 (Feb. 20, 1998)(routine uses [letters "o" and "p"] applicable to records in U.S. Attorney's Office's "Civil Case Files"). Furthermore, I am familiar with the CIA's routine use provision you cited at 70 Fed. Reg. 42418 (2005), as I am also with 32 C.F.R. 1901.51 (2006) which sets limitations on the CIA's ability to disclose information. In my professional opinion, the cited routine use provisions are quite vague and overbroad and I highly doubt they were designed to cover the specific circumstances that transpired. The provisions do not caution individuals who deal with the CIA or DOJ as to the jeopardy they are risking in providing specific personal information.

Let me very clear as to what my client is challenging. We take no issue with the fact that either DOJ or the CIA included the documents themselves into the public record. Without a doubt the overall documents are "arguably relevant to the litigation" and occurred in the course of "presenting information or evidence to a court". However, that does not necessarily mean that the entire contents of the documents fall within the routine use exception. That is the crux of the legal question. Exactly how does the filing of Mr. Sullivan's social security number, as the primary problem, and his home telephone and e-mail address fit within any of these cited routine uses?

As is well known, the CIA routinely redacts even the barest information concerning individuals associated with it. I have been asked on numerous occasions to redact individuals' names or instructed to not use their true last name even when they are overt employees. Filings made by the CIA frequently redact unnecessary information because of its overwhelming attitude towards secrecy and privacy. Yet we are to believe that no one, particularly at the CIA, thought twice about including Mr. Sullivan's social security number in a public court filing? That perhaps this might not be the smart or appropriate thing to do? I can not fathom that the personnel within your two agencies have not watched the news or read the newspapers over the last few years about identity fraud and the concerns that exist with the public availability of an individual's social security numbers.

The below quoted sections are taken from your own Department's analysis as set forth in the official publication of the "Overview of the Privacy Act of 1974" (I have **bolded** what I consider to be the more relevant language):

> The legislative history indicates that "a court is not defined as an 'agency' nor is it intended to be a 'person' for purposes of [the Privacy Act]," and that the Act was "not designed to interfere with access to information by the courts." 120 Cong. Rec. 36,967 (1974), reprinted in Source Book at 958-59. **However, the public filing of records with a court, during the course of litigation, does constitute a subsection (b) disclosure.** See Laningham v. United States Navy, No. 83-3238,

slip op. at 2-3 (D.D.C. Sept. 25, 1984), <u>summary judgment granted</u> (D.D.C. Jan. 7, 1985), <u>aff'd per curiam</u>, 813 F.2d 1236 (D.C. Cir. 1987); <u>Citizens Bureau of Investigation v. FBI</u>, No. 78-60, slip op. at 2-3 (N.D. Ohio Dec. 14, 1979). **Accordingly, any such public filing must be undertaken** with written consent or **in accordance with either the subsection (b)(3) routine use exception** or the subsection (b)(11) court order exception, both discussed below. <u>See generally</u> <u>Krohn v. United States Dep't of Justice</u>, No. 78-1536, slip op. at 3-11 (D.D.C. Mar. 19, 1984) (finding violation of Privacy Act where agency's disclosure of records as attachments to affidavit in FOIA lawsuit "did not fall within any of the exceptions listed in Section 552a"), <u>reconsideration granted & vacated in nonpertinent part</u> (D.D.C. Nov. 29, 1984) (discussed below).

**It is well settled that the "scope of [a] routine use is confined to the published definition."** <u>Doe v. Naval Air Station, Pensacola, Fla.</u>, 768 F.2d 1229, 1231 (11th Cir. 1985); <u>see also</u> <u>Parks v. IRS</u>, 618 F.2d 677, 681-82 (10th Cir. 1980); <u>Quilico v. United States Navy</u>, No. 80-C-3568, 1983 U.S. Dist. LEXIS 14090, at **9-12 (N.D. Ill. Sept. 2, 1983); <u>Local 2047, AFGE v. Def. Gen. Supply Ctr.</u>, 423 F. Supp. 481, 484-86 (E.D. Va. 1976), <u>aff'd</u>, 573 F.2d 184 (4th Cir. 1978). **In other words, a particular disclosure is unauthorized if it does not fall within the clear terms of the routine use**. <u>See, e.g.</u>, <u>Swenson v. USPS</u>, 890 F.2d 1075, 1078 (9th Cir. 1989) (47 Fed. Reg. 1203 (Jan. 11, 1982) held inapplicable to agency's disclosure of record referencing employee's EEO complaints to her congressmen as their inquiries were not "made at the request of" employee); <u>Tijerina v. Walters</u>, 821 F.2d 789, 798 (D.C. Cir. 1987) (47 Fed. Reg. 24,012 (June 2, 1982) held inapplicable to VA's unsolicited letter notifying state board of bar examiners of possible fraud committed by bar applicant because no violation of state law was "reasonably imminent," and letter was not in response to "official request"); <u>Doe v. DiGenova</u>, 779 F.2d 74, 86 (D.C. Cir. 1985) (43 Fed. Reg. 44,743 (1978) held inapplicable to VA psychiatric report because disclosed record itself did not "indicate a potential violation of law"); <u>Bechhoefer v. United States Dep't of Justice</u>, 179 F. Supp. 2d 93, 101-02 (W.D.N.Y. 2001) (although granting agency summary judgment on other grounds, finding that where a letter was collected by the agency due to its initial interest in investigating plaintiff's allegations of illegal drug activity by a local law enforcement agency, and was disclosed to that agency's investigator whose interest was in investigating possible unlawful, non-drug-related activity by plaintiff himself, such disclosure was not proper pursuant to a routine use providing for the disclosure to state and local law enforcement and regulatory agencies for law enforcement and regulatory purposes and stating that "it is difficult to see how [the] disclosure could be said to have been compatible with the purpose for which the letter was collected"), <u>aff'd on other grounds</u>, 312 F.3d 563 (2002), <u>cert. denied sub nom.</u> <u>Bechhoefer v. DEA</u>, 539 U.S. 514 (2003); **<u>Pontecorvo v. FBI</u>, No. 00-1511, slip op. at 13-15 (D.D.C. Sept. 30, 2001) (denying agency summary judgment and ordering discovery to determine whether the agency "overstepped [the] explicit restrictions" contained in its routine use)***[NOTE – I was counsel of record in <u>Pontecorvo</u>].*

**A particular area of controversy concerns whether the routine use exception can be invoked to publicly file records in court.** The Act's legislative history recognizes the "compatibility" of this type of disclosure. See 120 Cong. Rec. 40,405, 40,884 (1974), reprinted in Source Book at 858, 995 (routine use appropriate where Justice Department "presents evidence [tax information from IRS] against the individual" in court); see also Schuenemeyer v. United States, No. SA-85-773, slip op. at 1-2, 4 (W.D. Tex. Mar. 31, 1988) (finding no violation of Privacy Act for disclosure of litigant's medical records to Justice Department and U.S. Claims Court, as the information was used "in preparing the position of the USAF before the [court]," and was authorized under agency routine use).

In Krohn v. United States Department of Justice, No. 78-1536, slip op. at 4-7 (D.D.C. Mar. 19, 1984), however, the **court invalidated an FBI routine use allowing for "dissemination [of records] during appropriate legal proceedings," finding that such a routine use was impermissibly "vague" and was "capable of being construed so broadly as to encompass all legal proceedings."** In response to Krohn, OMB issued guidance to agencies in which it suggested a model routine use -- employing a "relevant and necessary to the litigation" standard -- to permit the public filing of protected records with a court. OMB Memorandum for the Senior Agency Officials for Information Resources Management 2-4 (May 24, 1985) (unpublished). Many agencies, including the Justice Department, have adopted "post-Krohn" routine uses designed to authorize the public filing of relevant records in court. See, e.g., 66 Fed. Reg. 36,593, 36,594 (July 12, 2001) (routine use [number 7] applicable to records in Justice Department's "Civil Division Case File System"); 63 Fed. Reg. 8666, 8667-68 (Feb. 20, 1998) (routine uses [letters "o" and "p"] applicable to records in U.S. Attorney's Office's "Civil Case Files").

It should be noted that none of the "post-Krohn" routine uses -- such as the ones cited above which employ an "arguably relevant to the litigation" standard -- have been successfully challenged in the courts. Cf. Russell v. GSA, 935 F. Supp. 1142, 1145-46 (D. Colo. 1996) (without analyzing propriety of routine use, finding disclosure in public pleadings of information regarding investigation of plaintiff was permissible under routine use providing for disclosure in proceeding before court where agency is party and records are determined "to be arguably relevant to the litigation"); Osborne, No. 94-30353, slip op. at 6-9 (N.D. Fla. May 18, 1995) (holding on alternative ground that disclosure of plaintiff's injury-compensation file to retired employee who had prepared file and who had been subpoenaed by plaintiff and was expecting to be deposed on matters documented in file was proper pursuant to routine use providing for disclosures "incident to litigation" and "in a proceeding before a court" because "deposition was a proceeding before [the] Court"); Sheptin v. United States Dep't of Justice, No. 91-2806, 1992 U.S. Dist. LEXIS 6221, at **6-7 (D.D.C. Apr. 30, 1992) (no wrongful disclosure where agency routine uses permit use of presentence report during course of habeas proceeding). **Such challenges could arise, either based upon an argument that the routine use does not satisfy the "compatibility" requirement of subsection (a)(7) of the Act, cf. Britt, 886 F.2d at 547-50**

> **(mere "relevance" to recipient entity held to be improper standard for a
> "compatible" routine use disclosure), or based upon an argument that the
> routine use effectively circumvents the more restrictive, privacy-protective
> requirements of subsection (b)(11),** cf. <u>Doe v. Stephens</u>, 851 F.2d at 1465-67
> (agency cannot use routine use exception to disclose records in response to
> subpoena where court had earlier ruled that such disclosure was improper under
> subsection (b)(11)).

Your conclusory assertion that "there is clearly no basis to allege that the disclosure of these
exhibits constituted a 'willful and intentional' violation of the Privacy Act" is premature, and I
know no such thing. As the opening remarks on the standard within the DOJ Guide states:

> In order for there to be any liability in a subsection (g)(1)(C) or (D) damages
> lawsuit, the agency must have acted in an "intentional or willful" manner. 5
> U.S.C. § 552a(g)(4). **It is important to understand that the words
> "intentional" and "willful" in subsection (g)(4) do not have their vernacular
> meanings; instead, they are "terms of art."** <u>White v. OPM</u>, 840 F.2d 85, 87
> (D.C. Cir. 1988) (per curiam). The Act's legislative history indicates that this
> unique standard is "[o]n a continuum between negligence and the very high
> standard of willful, arbitrary, or capricious conduct," and that it **"is viewed as
> only somewhat greater than gross negligence."** 120 Cong. Rec. 40,406 (1974),
> <u>reprinted in</u> Source Book at 862.

The situation, as we see it, is that disclosure of the social security number is simply so
blatantly obviously prohibited that we have no difficulty in reaching a good faith determination
that the disclosure meets the greater than gross negligence standard. Thus, under the
circumstances it is a fact based question as to whether the willful and intentional standard can be
met. Discovery will be necessary, as it was in <u>Pontecorvo</u> (notwithstanding the fact that both
DOJ and the FBI asserted otherwise), particularly regarding the level of protection the CIA
routinely affords to prevent the disclosure of social security numbers (or does that only apply to
individuals who remain in good favor of the CIA?).

Under your stated premise, no one should file a Privacy Act lawsuit challenging unlawful
disclosure ever again. You are essentially advocating the elimination of the existence of the
Privacy Act provisions that permit a challenge to a routine use interpretation. <u>See</u> <u>Covert v.
Harrington</u>, 876 F.2d 751, 757 (9th Cir. 1989)(fact that IG was following own regulations cannot
be decisive because agency "cannot promulgate regulations which ignore the dictates of the
Privacy Act"). With all due respect, you simply cannot expect me to accept this argument at face
value, especially when a social security number release has occurred. As the DOJ Privacy Act
Guide states:

> One district court, in a case concerning the Privacy Act's subsection (b)(3) routine
> use exception, has held that **a plaintiff may choose which particular "item of
> information" (one document) contained within a "collection or grouping of
> information" disclosed (a prosecutive report indicating a potential violation
> of law) to denominate as a "record" and challenge as wrongfully disclosed.**

5

Covert v. Harrington, 667 F. Supp. 730, 736-37 (E.D. Wash. 1987), aff'd on other grounds, 876 F.2d 751 (9th Cir. 1989). Purporting to construe the term "record" narrowly, the district court in Covert ruled that the Department of Energy's routine use -- 47 Fed. Reg. 14,333 (Apr. 2, 1982) (permitting disclosure of relevant records where "a record" indicates a potential violation of law) -- did not permit its Inspector General to disclose personnel security questionnaires to the Justice Department for prosecution because the questionnaires themselves did not reveal a potential violation of law on their face. 667 F. Supp. at 736-37. Covert is discussed further under "Conditions of Disclosure to Third Parties," "Agency Requirements," and "Civil Remedies," below.

I also respectfully direct your specific attention to the case law that grew out of Doe et al. v. Herman, 1999 U.S. Dist. LEXIS 17302 (W.D.Va. Oct 29, 1999). As I am sure you know, this case dealt with very similar facts surrounding the sensitivity of the federal government disclosing social security numbers without written consent under an alleged routine use. And while it is true some could argue that the Doe plaintiffs actually ultimately lost when the case reached the Supreme Court in Doe et al. v. Chao, 540 U.S. 614 (2004), the loss was on the issue of damages, not liability. I might add that even though the majority, if not all, of the plaintiffs failed to recover, the attorneys prevailed on the issue of attorney's fees. Doe et al. v. Chao, 2006 U.S. Dist. LEXIS 49033 (W.D.Va. July 19, 2006).

Candidly, by no means has my research been exhaustive, but I have devoted a significant amount of time to the issues primarily using the Department's own expert publication, as well as the book I co-edit, "LITIGATION UNDER THE FEDERAL OPEN GOVERNMENT LAWS 2006". I have not come across any case that is precedent within the D.C. Circuit that would foreclose any of the arguments, particularly those discussed in Doe and Covert, which I plan to raise on behalf of Mr. Sullivan. I certainly need more from you than simply the blanket statement that your respective routine uses apply as the documents are "arguably relevant to the litigation" and DOJ/CIA employees relied upon their own subjective good-faith interpretation of the provisions. If you are aware of case(s) that directly support your premise and preclude my arguments, I would ask that you specifically identify it for my review.

Will these Privacy Act claims face rough seas ahead in an effort to prevail? Absolutely. Privacy Act claims in general are almost impossible to successfully litigate, and I know that from more than a decade of experience. Is pursuing these claims in order to offer a challenge to the interpretation of the DOJ/CIA routine use provisions frivolous under Rule 11? Absolutely not.

Finally, I applaud the prompt reaction you showed in substituting redacted copies of the relevant records. I am personally grateful for your intervention. As I said previously, my intent in bringing the issue to your attention and requesting immediate reaction was not a subterfuge for the subsequent addition of the legal claims for the underlying conduct. I will stand by my word and not use the remedial action as proof of anything other than the appropriate conduct it was.

If you wish to engage in further conversation about these claims, please do not hesitate to contact me. As always, best to reach me via e-mail or cell at 202-498-0011. I do wish you, your family and your colleagues a very happy Thanksgiving celebration.

Sincerely,

/s/

Mark S. Zaid

cc: Elizabeth Shapiro, Esq.
       Federal Programs Branch, DOJ
    Vincent Garvey, Esq.
       Federal Programs Branch, DOJ
    John Sullivan
    Alan Cilman, Esq.

# EXHIBIT "2-D"

## Zaid Letter to Bryce dated November 21, 2007

# MARK S. ZAID, P.C.
## Attorney-At-Law

1250 CONNECTICUT AVENUE, N.W.
SUITE 200
WASHINGTON, DC 20036
———

TELEPHONE: (202) 454-2809
FACSIMILE: (202) 330-5610

MARK S. ZAID, MANAGING PARTNER
E-MAIL: MARK@MARKZAID.COM
BRADLEY P. MOSS, ASSOCIATE
E-MAIL: BRAD@MARKZAID.COM

November 21, 2007

VIA E-MAIL AND FACSIMILE

Peter Bryce
Trial Attorney
United States Department of Justice
Civil Division, Rm. 7308
20 Massachusetts Ave, NW
Washington, D.C. 20530

Re: Sullivan v. CIA et al., Civil Action No. 07-0685 (RWR)

Dear Peter:

This is a supplement to my letter of November 20, 2007.

With respect to the privacy/redaction policies of the Central Intelligence Agency and the willful and intentional standard under the Privacy Act of 1974, today I happened to receive a copy of a security clearance investigative file for another client.

Notwithstanding the fact that the individual who was the actual subject of the file was the person who requested the copy, the CIA *redacted* the individual's own personal social security number. That is how serious the CIA views, as a matter of policy, the disclosure of social security numbers.

So if you do plan on continuing to argue that the pursuit of these Privacy Act claims violates Rule 11 ethical standards, notwithstanding the fact that DOJ/CIA publicly disclosed Mr. Sullivan's social security number, please address this inconsistency in your arguments.

I again wish you, your family and your colleagues a very happy Thanksgiving celebration.

Sincerely,

/s/

Mark S. Zaid

cc: Elizabeth Shapiro, Esq.
        Federal Programs Branch, DOJ
    Vincent Garvey, Esq.
        Federal Programs Branch, DOJ
    John Sullivan
    Alan Cilman, Esq.

# EXHIBIT "2-E"

## Zaid Letter to Bryce dated December 26, 2007

# MARK S. ZAID, P.C.
## ATTORNEY-AT-LAW

1250 CONNECTICUT AVENUE, N.W.
SUITE 200
WASHINGTON, DC 20036
———

TELEPHONE: (202) 454-2809
FACSIMILE: (202) 330-5610

MARK S. ZAID, MANAGING PARTNER
E-MAIL: MARK@MARKZAID.COM
BRADLEY P. MOSS, ASSOCIATE
E-MAIL: BRAD@MARKZAID.COM

December 26, 2007

VIA E-MAIL AND FACSIMILE

Peter Bryce
Trial Attorney
United States Department of Justice
Civil Division, Rm. 7308
20 Massachusetts Ave, NW
Washington, D.C. 20530

Re: Sullivan v. CIA et al., Civil Action No. 07-0685 (RWR)

Dear Peter:

   This is a follow-up to my letters dated November 20, 2007, and November 21, 2007, neither of which have garnered a response.

   Your letter of November 15, 2007, requested that I provide you with my "good faith basis under Fed. R. Civ. P. 11 for asserting" the new Privacy Act claims set forth in the First Amended Complaint. Because I take very seriously an implicit, if not explicit, threat of Rule 11 sanctions for filing a frivolous claim, I voluntarily complied and provided you with a seven page letter with relevant legal analysis supporting the premise for the specific claims.

   Since our correspondence I have served the Summons and Amended Complaint upon the U.S. Department of Justice and the defendants' Answer, or other filing, is due no later than January 31, 2008. Given the approaching deadline, I respectfully request that you please inform me whether you are withdrawing your intimation that Rule 11 sanctions will be sought or your analysis, in light of the information I provided you, as to why you believe Rule 11 remains appropriate. I will happily consider any information you wish to provide me, but should you decline to do so and nevertheless seek Rule 11 sanctions against me, I believe your own actions will lack a good faith basis under Rule 11, especially in light of the detailed information I provided, and will take the appropriate steps in response.

   The courtesy of a timely response would be appreciated.

I wish you, your family and your colleagues a very happy New Years' celebration.

Sincerely,

/s/

Mark S. Zaid


cc: Elizabeth Shapiro, Esq.
        Federal Programs Branch, DOJ
    Vincent Garvey, Esq.
        Federal Programs Branch, DOJ
    John Sullivan
    Alan Cilman, Esq.

# EXHIBIT "2-F

## Zaid E-mail to Bryce dated January 2, 2008

### Mark S. Zaid

| | |
|---|---|
| **From:** | Mark S. Zaid [mark@markzaid.com] |
| **Sent:** | Wednesday, January 02, 2008 11:55 PM |
| **To:** | Peter.Bryce@usdoj.gov; Elizabeth.Shapiro@usdoj.gov; vincent.garvey@usdoj.gov |
| **Cc:** | mark@markzaid.com |

**Subject:** RE: Sullivan v. CIA

I trust you each had an enjoyable New Years celebration.

Given that your office threatened me with Rule 11 sanctions with such ease, I am quite disappointed not to have received the professional courtesy of a response to my letters of November 20, 2007, November 21, 2007 or December 26, 2007.

BTW, I trust you saw the front page of the Washington Post today. For your convenience I have reprinted it below.

# Online Records May Aid ID Theft

Government Sites Post Personal Data

By Bill Brubaker
Washington Post Staff Writer
Wednesday, January 2, 2008; A01

Colin L. Powell's Social Security number is out there. So is Troy Aikman's.

Want more?

The "social" of Maryland Attorney General Douglas F. Gansler (D) is xxx-xx-xx34.

In an era when government officials from President Bush to local sheriffs warn of the growing dangers of identity theft, the full Social Security numbers of untold numbers of Americans can be found in file rooms and on Web sites run by, well, governments.

"This is very dangerous," Gansler said after learning that his number had been posted on a Maryland government records site. "You know, a Social Security number is really the fingerprint to somebody's identification."

The Federal Trade Commission has estimated that 8.3 million Americans were victims of identity theft in 2005, the most recent data available. But the crown jewel in identity theft -- the Social Security number -- can be mined easily in the government's own records, creating a measure of social insecurity for millions, identity experts say.

Social Security numbers are readily available in many courthouses -- in land records and criminal and civil case files -- as well as on many government Web sites that serve up public documents with a few clicks of a mouse. From state to state, and even within states, there is little uniformity in how access to the private information in these records is controlled.

A recent spot-check found the nine-digit numbers -- introduced in 1936 to track employee earnings and benefits -- on hundreds of land deeds, death certificates, traffic tickets, creditors' filings and other documents related to civil and criminal court cases.

3/27/2008

Federal courts have banned the numbers from appearing on public documents since 2001. And in recent years, many jurisdictions, including Virginia, Maryland and the District, have enacted laws or made rules barring various types of personal information from being filed with courts or government agencies. Most court Web sites in the Washington region list partial Social Security numbers or none at all.

However, millions of paper records were filed across the United States before the laws and rules took effect. Generally, such records are not covered by the prohibitions. And court clerks said it would be virtually impossible to redact all of the Social Security numbers in them.

"That's just plain nutty," said Wendy Jones, former acting clerk of the Prince William County Circuit Court. "I mean, we're talking about hundreds and hundreds of thousands of files in our court alone."

In Loudoun County General District Court, Social Security numbers were found on documents filed in 38 of the 48 criminal cases heard by a judge on a recent day. The numbers were typed or written on summonses, arrest warrants, criminal complaints and jail commitment and release orders, among other documents.

"I don't like it. I don't like it at all," said the court's clerk, Judith S. Waddell. "Would you like your Social Security number being disclosed to the public? I know I wouldn't."

A one-hour search of Maryland's land records Web site found the Social Security numbers and signatures of two dozen property owners.

"It's alarming, because the government should be setting the example in really trying to protect people's private information," said state Sen. Jamie B. Raskin (D-Montgomery). "Look, there's a whole criminal underground now that thrives on stealing people's credit cards and usurping their identity for as long as they can."

A 15-minute search on the Maryland Department of Assessments and Taxation Web site found Social Security numbers on statements filed by creditors who had financed purchases by four consumers in Waldorf, Cambridge, Bowie and Landover in 2003 and 2004.

A dozen more numbers, including former secretary of state Powell's, turned up on a Fairfax County site that requires a $25 monthly subscription fee. Powell, in an e-mail, declined to comment.

A Texas land records site had the Social Security number of Aikman, the former Dallas Cowboys quarterback. Aikman, a Fox Sports analyst, declined through a Fox spokesman to comment.

Although it's rare to find the numbers in new criminal court filings in Maryland and the District, they often appear on summonses and arrest warrants in Virginia.

Typical is the Nov. 13 summons issued to a Sterling woman charged with failing to register her dog, a gray Shih Tzu named Puzzle, which had been declared dangerous. In addition to her name and Social Security number, the one-page document -- filed in Loudoun General District Court -- listed her home address, birth date, race, driver's license number, eye and hair color, height and weight.

"With that information, an identity thief could open up new accounts in her name," said Betsy Broder, an identity fraud expert with the Federal Trade Commission, "because the identity thief has virtually all the information that he or she needs to open up a credit card account, seek employment if they don't have legal status in this country, apply for a driver's license or, if they are arrested for some crime, use

this other person's identity as their own."

The Social Security number of another Loudoun defendant, charged with stealing a mountain bike and then failing to appear in court, was found on seven documents in his case file.

"This is an issue the General Assembly needs to look at," said Loudoun Circuit Court Clerk Gary M. Clemens, president of the Virginia Court Clerks' Association.

Identity fraud has been around for centuries. But widespread use of credit cards and the growth of the Internet have fueled a plague that costs businesses and consumers billions of dollars a year.

The problem took a giant leap in the public consciousness after the Sept. 11, 2001, terrorist attacks, when it was revealed that several hijackers had used fraudulently obtained IDs to open bank accounts, rent apartments and board planes.

The federal government responded with a law in 2004 that mandated prison sentences for people who use identity theft to commit other crimes and prohibited Social Security numbers from being displayed on newly issued driver's licenses. A presidential task force called on federal agencies last spring to "reduce the unnecessary use" of Social Security numbers, which it called "the most valuable commodity for an identity thief."

But with a few keystrokes, anybody can view the deed to Jamie and Sarah Raskin's house in Takoma Park.

The state senator said that when he refinanced the house in 1994, he gave no thought to the two Social Security numbers printed near the bottom of his property deed. But in March, he received a call from Betty "B.J." Ostergren, an activist from central Virginia who pushes lawmakers and government agencies to take sensitive personal data off state-run Web sites.

"She said, 'Do you know I was able to find your Social Security number and other private information about you and your wife online?' " Raskin said. "I was shocked, and I briefly flipped out, because, you know, these are days when everybody's privacy is under assault."

Ostergren's site, http://thevirginiawatchdog.com, offers dozens of examples of public figures whose Social Security numbers have appeared in public records in recent years. They include former CIA director Porter J. Goss, former Florida governor Jeb Bush (R) and former Virginia attorney general Jerry W. Kilgore (R).

"The government loves to spoon-feed criminals by putting these dern records on their Web sites," Ostergren said.

Raskin said he plans to call for legislation that would give Maryland residents the right to request redaction of their Social Security numbers from public records.

"The public certainly has the right to know who owns a particular property," he said. "But I don't think the public has the right to know what that person's Social Security number is."

Gansler cracked a joke when he learned recently that his number appeared on a real estate document he had signed in 1996.

"You can steal all of my money that you want. I don't have any," he said.

Then he turned serious.

"Our laws need to be tightened up," he said. "There's no legitimate reason why somebody should be able to surf the Internet and gain another person's Social Security number."

This electronic mail (e-mail) transmission is meant solely for the person(s) to whom it is addressed. It contains confidential information that may also be legally privileged  Any copying, dissemination or distribution of the contents of this e-mail by anyone other than the addressee or his or her agent for such purposes is strictly prohibited  If you have received this e-mail in error, please notify me immediately by telephone, facsimile or e-mail and purge the original and all copies thereof.
Thank you

Mark S. Zaid, Esq.
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809 direct
(202) 330-5610 fax

**From:** Mark S. Zaid [mailto:mark@markzaid.com]
**Sent:** Thursday, December 27, 2007 12:14 AM
**To:** Peter.Bryce@usdoj.gov
**Cc:** Elizabeth.Shapiro@usdoj.gov; vincent.garvey@usdoj.gov; mark@markzaid.com
**Subject:** Sullivan v. CIA

Peter, please see attached.

Happy New Year to you.

Mark

This electronic mail (e-mail) transmission is meant solely for the person(s) to whom it is addressed. It contains confidential information that may also be legally privileged  Any copying, dissemination or distribution of the contents of this e-mail by anyone other than the addressee or his or her agent for such purposes is strictly prohibited  If you have received this e-mail in error, please notify me immediately by telephone, facsimile or e-mail and purge the original and all copies thereof.
Thank you

Mark S. Zaid, Esq.
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809 direct
(202) 330-5610 fax

# EXHIBIT "2-G"

Bryce Letter to Zaid dated
January 3, 2008



U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW, Room 7308
Washington, D.C. 20001

---

Peter Bryce
Trial Attorney

Tel: (202) 616-8335
Fax: (202) 616-8470
peter.bryce@usdoj.gov

January 3, 2008

## VIA E-MAIL AND OVERNIGHT DELIVERY

Mark S. Zaid
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

Re:    Sullivan v. Central Intelligence Agency, et al., 1:07-cv-00685

Dear Mark,

As you requested, I write to respond to your various letters of November 20 and 21, and December 26. I have reviewed these letters, including the block quotes and statements in your letters of November 20 and 21. While I do not think a point-by-point response would be a productive use of your time or mine, I can tell you that for reasons stated in our earlier letter, among others, we remain convinced that your new Privacy Act claims do not comply with the standards of Fed. R. Civ. P. 11.

As a courtesy, I would also draw your attention to a particular case I have now found in this circuit, Patrick Eddington, et al., v. Central Intelligence Agency, et al., C.A. No. 97-0872 (D.D.C.) (Jackson, J.). The decisions and other papers in that case show: (1) that you have previously advanced virtually identical claims on behalf of other clients; (2) that such claims were summarily rejected in the district court and on appeal; and (3) that you were required by the D.C. Circuit to show cause why you should not be sanctioned under Fed. R. App. P. 38 for filing a frivolous appeal. I point this out not to make you feel "insulted," but simply to remind you that you have been put on notice before about the relative merit (or lack thereof) of this sort of claim.

Accordingly, we reiterate our request that you withdraw the claims at issue.

As an additional courtesy, moreover, I will advise you that Department of Justice records do not support your most recent representation that you have properly served the

amended complaint on the Department of Justice.

Sincerely,

Peter Bryce

# EXHIBIT "2-H"

## Zaid Letter to Bryce dated January 17, 2008

# MARK S. ZAID, P.C.
### Attorney-At-Law

1250 CONNECTICUT AVENUE, N.W.
SUITE 200
WASHINGTON, DC 20036
_____

TELEPHONE: (202) 454-2809
FACSIMILE: (202) 330-5610

MARK S. ZAID, MANAGING PARTNER
E-MAIL: MARK@MARKZAID.COM
BRADLEY P. MOSS, ASSOCIATE
E-MAIL: BRAD@MARKZAID.COM

January 17, 2008

<u>VIA E-MAIL AND FACSIMILE</u>

Peter Bryce
Trial Attorney
United States Department of Justice
Civil Division, Rm. 7308
20 Massachusetts Ave, NW
Washington, D.C. 20530

Re: <u>Sullivan v. CIA et al.</u>, Civil Action No. 07-0685 (RWR)

Dear Peter:

I am writing with respect to your letter of January 3, 2008.

We will not be withdrawing our new Privacy Act claims surrounding the release of my client's social security number into the public domain. Notwithstanding the fact that I presented you with detailed legal and factual analysis (as well as some thoughtful questions such as why the CIA redacts SSNs in Privacy Act responses to the actual individual but did not do so here), you have provided absolutely no reason other than "because we said so" to support your assertion that these claims violate the tenets of Rule 11. That is simply insufficient.

I am obviously well aware of what transpired in <u>Patrick Eddington, et al., v. Central Intelligence Agency, et al.</u>, C.A. No. 97-0872 (D.D.C.)(Jackson, J.), and I believe the confusion that existed that I unfortunately failed to clarify before Judge Jackson will not occur in this case. Moreover, while the D.C. Circuit, for reasons unknown, did issue an order to show cause as to why the appeal should not be considered frivolous, I would point out to you that, in fact, there was no determination of frivolity ever reached. Ergo, one can just as easily expound that, although in <u>Eddington</u> a similar Privacy Act claim substantively lost, the D.C. Circuit held the claim was <u>not</u> frivolous.

Furthermore, I have consulted with several colleagues who are quite familiar with privacy issues and the Privacy Act. They have reviewed the First Amended Complaint and the correspondence between us. While they share the same view as I do, to which I freely admit, that

these types of claims are very difficult, they all believed the claim was legitimate and will execute declarations under penalty of perjury attesting to that position

I will openly reiterate that, in light of all the existing facts, I will view any filing by your office to seek Rule 11 sanctions in this matter to be itself a violation of Rule 11 and reciprocally respond. I truly hope that this path is not one that is pursued as I find it doubtful that the Court will appreciate the attempts from either side.

With respect to service upon the Department of Justice, a new Summons and First Amended Complaint is being mailed today to the U.S. Attorney for the District of Columbia. As you know, however, the Department received its copy of the Summons and First Amended Complaint on December 17, 2007.

Sincerely,

/s/

Mark S. Zaid


cc: Elizabeth Shapiro, Esq.
     Federal Programs Branch, DOJ
   Vincent Garvey, Esq.
     Federal Programs Branch, DOJ
   John Sullivan
   Alan Cilman, Esq.

# EXHIBIT "2-I"

## Zaid Letter to Bryce dated January 21, 2008

# MARK S. ZAID, P.C.
## ATTORNEY-AT-LAW

1250 CONNECTICUT AVENUE, N.W.
SUITE 200
WASHINGTON, DC 20036

———

TELEPHONE: (202) 454-2809
FACSIMILE: (202) 330-5610

MARK S. ZAID, MANAGING PARTNER
E-MAIL: MARK@MARKZAID.COM
BRADLEY P. MOSS, ASSOCIATE
E-MAIL: BRAD@MARKZAID.COM

January 21, 2008

<u>VIA E-MAIL AND FACSIMILE</u>

Peter Bryce
Trial Attorney
United States Department of Justice
Civil Division, Rm. 7308
20 Massachusetts Ave, NW
Washington, D.C. 20530

Re: <u>Sullivan v. CIA et al.</u>, Civil Action No. 07-0685 (RWR)

Dear Peter:

This is a supplement to my letter dated January 17, 2008.

The filing of my client's full social security number by your Department and its' client the Central Intelligence Agency was also a violation of the U.S. District Court for the District of Columbia's "NOTICE REGARDING PRIVACY AND PUBLIC ACCESS TO ELECTRONIC CIVIL CASE FILES". This policy, which clearly obligated the Government to redact Mr. Sullivan's social security number, was adopted in September 2004, in compliance with the Judicial Conference of the United States, and the E-Government Act of 2002, as amended. A copy of the policy is attached for your convenience, and it can be found at: *http://www.dcd.uscourts.gov/civil-privacy.pdf*.

I am respectfully once again requesting you affirmatively declare that you will not seek Rule 11 sanctions against any attorney connected to this case. Again, in light of the evidence and legal analysis that your office has been made aware of, any effort to seek Rule 11 sanctions will itself be viewed as a frivolous filing that will be, I regret to state, reciprocated in kind.

Sincerely,

/s/

Mark S. Zaid

Attachment
cc: Elizabeth Shapiro, Esq.
        Federal Programs Branch, DOJ
    Vincent Garvey, Esq.
        Federal Programs Branch, DOJ
    John Sullivan
    Alan Cilman, Esq.

# EXHIBIT "2-J"

## Redacted Investigative Pages

Standard Form 86
Revised September 1995
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

## QUESTIONNAIRE FOR
## NATIONAL SECURITY POSITIONS

Form approved:
O.M.B. No 3206 0007
NSN 7540-00-634-4039
86-111

| Part 1 | Investigating Agency Use Only | | Codes | | Case Number | | |
|---|---|---|---|---|---|---|---|

**Agency Use Only (Complete Items A through F using instructions provided by requesting agency)**

| | | | | | | | F Date of Action | Month | Day | Year |
|---|---|---|---|---|---|---|---|---|---|---|
| A Type of Investigation | B Extra Coverage | C Sensitivity Level | D Access | E Nature of Action Code | | | | | | |

| Q Geographic Location | | H Position Code | I Position Title | | | | | | Zip Code |
|---|---|---|---|---|---|---|---|---|---|
| J SON | K Location of Official Personnel Folder ☐ None ☐ NPRC ☐ At SON | | Other Address | | | | | | Zip Code |
| L SOI | M Location of Security Folder ☐ None ☐ At SOI ☐ NPI | | Other Address | | | | | | |

| N OPAC-ALC Number | O Accounting Data and/or Agency Case Number | | | | | |
|---|---|---|---|---|---|---|
| P Requesting Official | Name and Title | | Signature | | Telephone Number | Date |

**Caution: Items 1 thru 5 items should begin with the individual's name.**

| 1 | FULL NAME | - If you have only initials in your name, use them and state (IO). | - If you are a "Jr.," "Sr.," etc., enter this in the box after | | | | 2 | DATE OF BIRTH | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | - If you have no middle name, enter "NMN." | Your middle name. | | | | | Month | Day | Year |

| Last Name | | First Name | Middle Name Scott | Jr., II, etc. | Month 12 | Day 29 | Year 1981 |
|---|---|---|---|---|---|---|---|

| 3 | PLACE OF BIRTH - Use the two letter code for the State | | | | | 4 | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|---|
| City | County | | State | Country (if not in the United States) | | | |
| Fairfax | Fairfax | | VA | United States | | | |

| 5 | OTHER NAMES USED |
|---|---|

Give other names you used and the period of time you used them (for example: your maiden name, name(s) by a former marriage, former name(s), alias(es), or nickname(s)). If the other name is your maiden name, put "see" in front of it.

| Name #1 | N/A | Month/Year | To | Month/Year | Name #3 | | Month/Year | To | Month/Year |
|---|---|---|---|---|---|---|---|---|---|
| Name #2 | | Month/Year | To | Month/Year | Name #4 | | Month/Year | To | Month/Year |

| 6 | OTHER IDENTIFYING INFORMATION | Height (feet and inches) 6'2" | Weight (pounds) 212 | Hair Color Brown | | Eye Color Brown | Sex (mark one box) ☐ Female ☒ Male |
|---|---|---|---|---|---|---|---|

| 7 | TELEPHONE NUMBERS | Work (include Area Code and extension) ☐ Day ☒ Night | | | Home (include area code) ☒ Day ☐ Night |
|---|---|---|---|---|---|

| 8 | CITIZENSHIP | ☒ I am a U.S. citizen or national by birth in the U.S. or U.S. territory/possession. | Answer Items b and d | 10 | Your Mother's Maiden Name |
|---|---|---|---|---|---|
| | Mark the box at the right, that reflects your current citizenship status, and follow its instructions. | ☐ I am a U.S. citizen, but I was NOT born in the U.S. | Answer Items b, c, and d | | |
| | | ☐ I am not a U.S. citizen. | Answer Items b, and e | | |

| Ⓒ | UNITED STATES CITIZENSHIP | If you are a U.S. Citizen, but were not born in the U.S., provide information about one or more of the following proofs of your citizenship. |
|---|---|---|

| Naturalization Certificate (Where was the certificate issued?) | | City | | State | Certificate Number | Month/Day/Year Issued |
|---|---|---|---|---|---|---|
| Court | | | | | | |

| Citizenship Certificate (Where was the certificate issued?) | | | State | Certificate Number | Month/Day/Year Issued |
|---|---|---|---|---|---|
| City | | | | | |

| State Department Form 240 - Report of Birth Abroad of a Citizen of the United States | | | |
|---|---|---|---|
| Give the date the form was prepared and give an explanation if needed. | Month/Day/Year | Explanation | |

| U.S. Passport | | | | | Month/Day/Year Issued |
|---|---|---|---|---|---|
| This may be either a current or previous U.S. Passport. | Passport Number | | | | 12/02/2006 |

| Ⓓ | DUAL CITIZENSHIP N/A | If you are (or were) a dual citizen of the United States and another country, provide the name of that country in the space to the right. | Country |
|---|---|---|---|

| Ⓔ | ALIEN | If you are an alien, provide the following information: | | | | | Alien Registration Number | Country(ies) of Citizenship |
|---|---|---|---|---|---|---|---|---|
| | Place you entered the United States | City | | State | Date you entered the U.S. Month Day Year | | | |

Page 1

**(24)  YOUR USE OF ILLEGAL DRUGS AND DRUG ACTIVITY**

The following questions pertain to the illegal use of drugs or drug activity.  You are required to answer the questions fully and truthfully, and your failure to do so could be grounds for an adverse employment decision or action against you, but neither your truthful responses nor information derived from your responses will be used as evidence against you in any subsequent criminal proceeding.

**(a)**  Since the age of 16 or in the last 7 years, whichever is shorter, have you illegally used any controlled substance, for example, marijuana, cocaine, crack cocaine, hashish, narcotics (opium, morphine, codeine, heroin, etc.), amphetamines, depressants (barbiturates, methaqualone, tranquilizers, etc.), hallucinogenics (LSD, PCP, etc.), or prescription drugs?    ☐ Yes  ☒ No

**(b)**  Have you ever illegally used a controlled substance while employed as a law enforcement officer, prosecutor, or courtroom official; while possessing a security clearance; or while in a position directly and immediately affecting the public safety?    ☐ Yes  ☒ No

**(c)**  In the last 7 years, have you been involved in the illegal purchase, manufacture, trafficking, production, transfer, shipping, receiving, or sale of any narcotic, depressant, stimulant, hallucinogen, or cannabis for your own intended profit or that of another?    ☐ Yes  ☒ No

If you answered "Yes" to a or b above, provide the date(s), identify the controlled substance(s) and/or prescription drugs used, and the number of times each was used.

| Month/Year | To | Month/Year | Controlled Substance/Prescription Drug Used | Number of Times Used |
|---|---|---|---|---|
|  | To |  |  |  |
|  | To |  |  |  |

**(25)  YOUR USE OF ALCOHOL**

In the last 7 years, has your use of alcoholic beverages (such as liquor, beer, wine) resulted in any alcohol-related treatment or counseling (such as for alcohol abuse or alcoholism)?    ☐ Yes  ☒ No

If you answered "Yes," provide the dates of treatment and the name and address of the counselor or doctor below.  Do not repeat information reported in response to item 21 above.

| Month/Year | To | Month/Year | Name/Address of Counselor or Doctor | State | ZIP Code |
|---|---|---|---|---|---|
|  | To |  |  |  |  |

**(26)  YOUR INVESTIGATIONS RECORD**

**(a)**  Has the United States Government ever investigated your background and/or granted you a security clearance?  If "Yes," use the codes that follow to provide the requested information below.  If "Yes," but you can't recall the investigating agency and/or the security clearance received, enter "Other" agency code or clearance code, as appropriate, and "Don't know" or Don't recall" under the "Other Agency" heading, below.  If your response is "No," or you don't know or can't recall if you were investigated and cleared, check the "No" box.    ☒ Yes  ☐ No

| Codes for Investigating Agency | | | Codes for Security Clearance Received | | |
|---|---|---|---|---|---|
| 1 - Defense Department | 4 - FBI | | 0 - Not Required | 3 - Top Secret | 6 - L |
| 2 - State Department | 5 - Treasury Department | | 1 - Confidential | 4 - Sensitive Compartmented Information | 7 - Other |
| 3 - Office of Personnel Management | 6 - Other (Specify) | | 2 - Secret | 5 - Q | |

| Month/Year | Agency Code | Other Agency | Clearance Code | Month/Year | Agency Code | Other Agency | Clearance Code |
|---|---|---|---|---|---|---|---|
| 04/2008 | 6 | FAA | 7 |  |  |  |  |
|  |  |  |  |  |  |  |  |

**(b)**  To your knowledge, have you ever had a clearance or access authorization denied, suspended, or revoked, or have you ever been debarred from government employment?  If "Yes," give date of action and agency.  Note:  An administrative downgrade or termination of a security clearance is not a revocation.    ☐ Yes  ☒ No

| Month/Year | Department or Agency Taking Action | Month/Year | Department or Agency Taking Action |
|---|---|---|---|
|  |  |  |  |

**(27)  YOUR FINANCIAL RECORD**

**(a)**  In the last 7 years, have you filed a petition under any chapter of the bankruptcy code (to include Chapter 13)?    ☐ Yes  ☒ No

**(b)**  In the last 7 years, have you had your wages garnished or had any property repossessed for any reason?    ☐ Yes  ☒ No

**(c)**  In the last 7 years, have you had a lien placed against your property for failing to pay taxes or other debts?    ☐ Yes  ☒ No

**(d)**  In the last 7 years, have you had any judgments against you that have not been paid?    ☐ Yes  ☒ No

If you answered "Yes" to a, b, c, or d, provide the information requested below:

| Month/Year | Type of Action | Amount | Name Action Occurred Under | Name/Address of Court or Agency Handling Case | State | ZIP Code |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Enter your Social Security Number before going to the next page    →  ▇▇▇▇▇

**Page 8**

Standard Form 86
Revised September 1995
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

Form approved:
O.M.B. No 3206 0007
NSN 7540-00-634-4036
86-111

# UNITED STATES OF AMERICA
## AUTHORIZATION FOR RELEASE OF INFORMATION
Carefully read this authorization to release information about you, then sign and date it in ink.

I Authorize any investigator, special agent, or other duly accredited representative of the authorized Federal agency conducting my background investigation, to obtain any information relating to my activities from individuals, schools, residential management agents, employers, criminal justice agencies, credit bureaus, consumer reporting agencies, collection agencies, retail business establishments, or other sources of information. This information may include, but is not limited to, my academic, residential, achievement, performance, attendance, disciplinary, employment history, criminal history record information, and financial and credit information. I authorize the Federal agency conducting my investigation to disclose the record of my background investigation to the requesting agency for the purpose of making a determination of suitability or eligibility for a security clearance.

I Understand that, for financial or lending institutions, medical institutions, hospitals, health care professionals, and other sources of information, a separate specific release will be needed, and I may be contacted for such a release at a later date. Where a separate release is requested for information relating to mental health treatment or counseling, the release will contain a list of the specific question, relevant to the job description, which the doctor or therapist will be asked.

I Further Authorize any investigator, special agent, or other duly accredited representative of the U.S. Office of Personnel Management, the Federal Bureau of Investigation, the Department of Defense, the Defense Investigative Service, and any other authorized Federal agency, to request criminal record information about me from criminal justice agencies for the purpose of determining my eligibility for access to classified information and/or for assignment to, or retention in, a sensitive National Security position, in accordance with 5 U.S.C. 9101. I understand that I may request a copy of such records as may be available to me under the law.

I Authorize custodians of records and other sources of information pertaining to me to release such information upon request of the investigator, special agent, or other duly accredited representative of any Federal agency authorized above regardless of any previous agreement to the contrary.

I Understand that the information released by records custodians and sources of information is for official use by the Federal Government only for the purposes provided in this Standard Form 86, and that it may be redisclosed by the Government only as authorized by law.

Copies of this authorization that show my signature are as valid as the original release signed by me. This authorization is valid for five (5) years from the date signed or upon the termination of my affiliation with the Federal Government, whichever is sooner. Read, sign and date the release on the next page if you answered "Yes" to question 21.

| Signature  (Sign in ink) | Full Name  (Type or Print Legibly) | Date Signed |
|---|---|---|
| | | June  11, 07 |
| Other Names Used | | Social Security Number |
| Current Address (Street, City) | State | Zip Code | Telephone Number |
| | VA | 22124 | |

Page 10

# EXHIBIT "3"

# CIA Letter To
# John F. Sullivan

(3)

MAR 1 0 2005

Mr. John F. Sullivan
1774 Wainwright Drive
Reston, VA 20190-3442

Dear Mr. Sullivan:

This letter is in response to your letters, received
2 March 2005 and 3 March 2005, requesting a review of the
Agency's security determination, a copy of your
investigative file, and a personal appearance. Please note
that all appeal reviews are assigned and handled in the
order in which they are received; your appeal has been
received and is now in queue. An appeals officer will
contact you when your case is assigned to arrange for your
personal appearance. You will be notified in writing of
the outcome of your appeal.

Enclosed please find a copy of your investigative file
and the specific documents, records, and reports the
Government used to arrive at its security determination in
your case. These records have been provided to you to the
extent they would be provided if requested under the
Privacy Act or the Freedom of Information Act. Certain
categories of Government information such as polygraph
records are exempt in their entirety from release. The
release of the file has been made pursuant to the
provisions of Executive Order 12968.

To facilitate our processing, changes in your address,
telephone number, or employment should be sent to:

Elizabeth V. York
PO Box 6282
West Hyattsville, MD 20782

Sincerely,

Elizabeth V. York

Elizabeth V. York
Senior Adjudication Officer

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN SULLIVAN        *
         *
     Plaintiff,      *
         *     Civil Action No: 07-0685 (RWR)
     v.      *
         *
CENTRAL INTELLIGENCE AGENCY   *
et al.      *
         *
     Defendants.      *
\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>ORDER</u>

Upon consideration of the filings regarding Defendants' Motion to Dismiss First Amended Complaint, and it appearing that the relief prayed is just and appropriate, it is this _____ day of _____ 2008,

ORDERED, that defendants' Motion is denied without prejudice; and

FURTHER ORDERED, that the parties shall have 120 days from the date of this Order to conduct discovery.

_____
UNITED STATED DISTRICT JUDGE